Argued and submitted November 3, 1987, decisions of Court of Appeals and LCDC
reversed in part and affirmed in part and remanded to LCDC for further proceedings
March 29, 1988

## 1000 FRIENDS OF OREGON,
*Petitioner/Respondent on Review,*

*v.*

## LAND CONSERVATION AND DEVELOPMENT COMMISSION, LANE COUNTY,
*Respondents/Petitioners on Review,*

*and*

## OREGON FOREST INDUSTRIES COUNCIL,
*Intervenor-Respondent (below).*

(LCDC 84-ACK-201; CA A33755;
SC S33694, S33797, S33798, S34114, S33720)

752 P2d 271

Allen L. Johnson, Eugene, argued the cause for Lane County. On the petition for review and supplemental petition was William A. Van Vactor, Lane County Counsel, Eugene.

Michael Reynolds, Assistant Attorney General, Salem, argued the cause for Land Conservation and Development Commission. On the petition for review were Dave Frohnmayer, Attorney General, William F. Gary, Deputy Attorney General, Virginia L. Linder, Solicitor General, and Michael A. Holstun, Assistant Attorney General, Salem.

Robert L. Liberty, Portland, argued the cause and filed a petition for review on the merits and filed petitions for review on costs and attorney fees for 1000 Friends of Oregon.

JONES, J.

## JONES, J.

The principal issue in this land use case concerns Oregon's Statewide Planning Goal 4, which directs that forest lands be conserved for forest use.[1] The disputes also raise important questions concerning the relationship between Goal 4 and Goal 3[2] and the respective burdens on all parties

---

[1] Goal 4 seeks "[t]o conserve forest lands for forest uses." It provides that "[f]orest land shall be retained for the production of wood fibre and other forest uses. Lands suitable for forest uses shall be inventoried and designated as forest lands. Existing forest land uses shall be protected unless proposed changes are in conformance with the comprehensive plan." Goal 4 defines:

> "**Forest lands**—are (1) lands composed of existing and potential forest lands which are suitable for commercial forest uses; (2) other forested lands needed for watershed protection, wildlife and fisheries habitat and recreation; (3) lands where extreme conditions of climate, soil and topography require the maintenance of vegetative cover irrespective of use; (4) other forested lands in urban and agricultural areas which provide urban buffers, wind breaks, wildlife and fisheries habitat, livestock habitat, scenic corridors, and recreational use."

and

> "**Forest uses**—are (1) the production of trees and the processing of forest products; (2) open space, buffers from noise, and visual separation of conflicting uses; (3) watershed protection and wildlife and fisheries habitat; (4) soil protection from wind and water; (5) maintenance of clean air and water; (6) outdoor recreational activities and related support services and wilderness values compatible with these uses; and (7) grazing land for livestock."

These and other descriptions of LCDC's goals are taken from "Oregon's Statewide Planning Goals 1985," which contains the most recent and accurate statement of LCDC's goals. *See 1000 Friends of Oregon v. LCDC (Curry Co.),* 301 Or 447, 452 n 4, 724 P2d 268 (1986).

[2] Goal 3 seeks "[t]o preserve and maintain agricultural lands." Goal 3 states:

> "Agricultural lands shall be preserved and maintained for farm use, consistent with existing and future needs for agricultural products, forest and open space. These lands shall be inventoried and preserved by adopting exclusive farm use zones pursuant to ORS chapter 215. Such minimum lot sizes as are utilized for any farm use zones shall be appropriate for the continuation of the existing commercial agricultural enterprise within the area."

ORS 215.203(2)(a) defines "farm use" as:

> "the current employment of land for the primary purpose of obtaining a profit in money by raising, harvesting and selling crops or the feeding, breeding, management and sale of, or the produce of, livestock, poultry, fur-bearing animals or honeybees or for the dairying and the sale of dairy products or any other agricultural or horticultural use or animal husbandry or any combination thereof. 'Farm use' includes the preparation and storage of the products raised on such land for human use and animal use and disposal by marketing or otherwise. 'Farm use' also includes the propagation, cultivation, maintenance and harvesting of aquatic species. It does not include the use of land subject to the provisions of ORS chapter 321, except land used exclusively for growing cultured Christmas trees as defined in subsection (3) of this section."

involved in the development and acknowledgment of comprehensive land use plans.

After several earlier attempts, Lane County presented its proposed comprehensive rural land use plan to the Land Conservation and Development Commission (LCDC) in February 1984. LCDC's initial response in July 1984 listed several deficiencies in the plan. LCDC granted Lane County a continuance, during which Lane County responded to LCDC's objections by revising the plan and presenting additional evidence to LCDC. In September 1984, LCDC acknowledged the Lane County plan as being in compliance with the statewide land use goals (goals). 1000 Friends of Oregon (1000 Friends) objected and sought judicial review by the Court of Appeals on seven assignments of error. The Court of Appeals reversed LCDC on all but one of the assignments of error. *1000 Friends of Oregon v. LCDC (Lane Co.),* 83 Or App 278, 731 P2d 457 (1987). Lane County, LCDC and 1000 Friends petitioned this court for review. We reverse the decision of the Court of Appeals in part, affirm in part, and remand the case to LCDC for further action.

The Court of Appeals was faced with seven assignments of error, each of which is also before this court. Most of these assignments require individual discussion, beginning with the question of whether the Lane County plan properly allows dwellings on lands zoned for forest uses.

## DWELLINGS ON FOREST LANDS

■ The intent of Goal 4 is "to conserve forest lands for forest uses." The goal includes commercial forestry as well as wildlife habitat and watershed protection, forests as buffer zones, and several other uses of forest lands in Oregon. In its plan, Lane County zoned large portions of the county as forest land. Lane County established two types of forest zones, non-impacted forest lands and impacted forest lands. The latter lands Lane County defined as "impacted by non-forest uses." Lane County Development Code (LC) 16.211(1)(a). Residences were not permitted on non-impacted forest lands, but dwellings were permitted on impacted forest lands, if, among other reasons, they were "necessary and accessory" to forest management.

Specifically, LC 16.211(b)(3) provides that "[a] dwelling or mobile home, and any accessory structures, on a vacant

legal lot containing at least 10 acres shall be deemed accessory and necessary to the forest management of the legal lot" if certain criteria are met. We return to this provision below. Because Lane County and LCDC argue that LCDC is entitled to a measure of judicial "deference" for its interpretation of the applicable legal standard, we first address how that argument applies to the Lane County plan provisions at issue here.

"Deference" is one of those general terms that can obscure rather than aid analysis if it is used to blanket a variety of distinct issues of judicial review. In this case, for instance, LCDC's brief invokes deference to its "interpretive discretion," but issues of "discretion" differ from issues of "interpretation." *Compare* ORS 183.482(8)(a) *with* ORS 183.482(8)(b).

The scope of review of another entity's decision, whether by an agency like the Land Use Board of Appeals (LUBA) or by LCDC or by a court, involves a rule of law. *See* Brodie and Linde, *State Court Review of Administrative Action: Prescribing the Scope of Review,* 1977 Ariz St L J 537. It ordinarily (except for any remaining common-law or equitable remedies) is derived from more or less explicit statutes, not invented by courts. Statutes can and generally do prescribe how far courts may go in reviewing an agency's determination of the factual predicate of its action, an agency's determination of the legal premises for its action, and its exercise of discretion within the range of discretion delegated to it by law. *See Megdal v. Board of Dental Examiners,* 288 Or 293, 318-20, 605 P2d 273 (1980). In *Younger v. City of Portland,* 305 Or 346, 358-60, 752 P2d 262 (1988), also decided today, we set out the relations between review by the Land Use Board of Appeals (LUBA) of a local government's factfinding for "substantial evidence in the whole record," ORS 197.835(8)(a)(C), and review by the Court of Appeals of LUBA's application of that scope of review, ORS 197.850(9). It is possible to describe these measures of review as "deference" to another agency's factfinding, but the difference between these reviewing functions and review of legal premises or of agency discretion cautions against a generalization, "deference," that does not appear in any statute.[3]

---

[3] An atypical attempt to legislate specifically on the issue of what was considered excessive judicial deference was the proposed Bumpers Amendment of 1979 to the

The present issue concerns LCDC's application of written rules, its own Goals and Lane County's ordinance, not findings of fact or the exercise of discretion. On this issue, LCDC reviews Lane County's ordinance for "compliance with [statewide land use] goals." ORS 197.040(2)(d). Review is "confined to the record of proceedings before the local government, any comments, objections and exceptions * * * and the report of the director," ORS 197.251(4), and the acknowledgment order must "include a clear statement of findings which sets forth the basis for the approval * * * of acknowledgment," ORS 197.251(5), and, further, the findings shall "[i]nclude a clear statement of findings in support of the determination of compliance and noncompliance," ORS 197.251(5)(b). The Court of Appeals and this court review to see if LCDC "has erroneously interpreted a provision of law," ORS 197.650(1), 183.482(8)(a). The immediate question is what role LCDC's own interpretations play in the courts' review.

Ordinarily lawmakers expect courts themselves to decide disputed legal issues. *Compare* ORS 183.482(8)(a) (requiring court to correct errors of law) *with* ORS 183.482(7) (barring court from substituting its judgment on factual or discretionary decisions). *See also* Jaffe, Judicial Control of Administrative Action 556 (1965). This court has recognized that in some circumstances an agency's interpretation of a

---

Federal Administrative Procedure Act. *See* 5 Davis, Administrative Law Treatise 401, § 29.16 (2d ed 1984); O'Reilly, *Deference Makes a Difference: A Study of Impacts of the Bumpers Judicial Review Amendment,* 49 Cin L Rev 739 (1980); and Recommendations 79-6 and 81-2 of the Administrative Conference of the United States (1981). For an analysis of judicial deference in the wake of the discussion prompted by the Bumpers Amendment, see Levin, *Identifying Questions of Law in Administrative Law,* 74 Geo. L J 1 (1985).

Professor K. C. Davis wrote about the United States Supreme Court's treatment of "deference":

"Deference for an agency's interpretation of law is typically unmentioned in Supreme Court opinions in which the Court substitutes its interpretation for the agency's. Indeed, such deference seems to be absent whenever the Court disagrees with the agency's interpretation. 'Deference' becomes a concept that is useful when the Court is in doubt about the interpretation but is satisfied to let the agency's decision stand.

"Cases in which the Supreme Court substitutes judgment are quite numerous—far more numerous than deference cases. The Court substitutes judgment in some cases even when the question of interpretation involves policymaking within the agency's specialized area."

5 Davis, *supra* at 403.

legal rule "though not binding is entitled to our careful consideration." *Knapp v. City of North Bend,* 304 Or 34, 741 P2d 505 (1987). The weight, or "consideration," "respect," "deference," "attention" (none of which should be taken as a term of art[4]), to be given an agency's interpretation can be implied from a number of characteristics:

(1) The agency may have a broad mandate to promulgate rules to be administered by itself. This does not give an agency carte blanche in interpreting its rules. But the legislative choice to entrust the agency both with setting standards and with applying them can imply that the agency's view of its standards (assuming that they are within their authorizing law and are consistently applied) is to be given some appropriate respect by the courts. *See, e.g.,* 5 Davis, Administrative Law Treatise 399-404, §29.16 (1984). Sometimes the body interpreting the rule may have direct political authority from the affected community and be accountable to it. *Anderson v. Peden,* 284 Or 313, 318 n 3, 587 P2d 59 (1978).[5]

(2) A similar implication may arise when a statute assigns the agency's tasks in broad terms that delegate to the agency responsibility for completing a general legislative policy. *See Springfield Education Assn. v. School Dist.,* 290 Or 217, 621 P2d 547 (1980). Particularly when an agency originated the statutory text that it interprets or when its administration of the statute has been actively examined and considered by the statute's legislative parents after its enactment, a court may be more cautious to conclude that the agency's consistent reading of the text misinterprets the

---

[4] *Springfield Education Assn. v. School Dist.,* 290 Or 217, 221, 621 P2d 547 (1980), quoted these phrases:

" 'great weight,' *City of Portland v. Duntley,* 185 Or 365, 203 P2d 640 (1940), and *Curly's Dairy v. Dept. of Agriculture,* 244 Or 15, 415 P2d 740 (1966); 'careful consideration,' *Gouge v. David,* 185 Or 437, 454, 202 P2d 489 (1949), and *Van Ripper v. Liquor Cont. Com.,* 228 Or 581, 593, 365 P2d 109 (1961)."

[5] *Anderson,* 284 Or at 318 n 3, quoted *Fifth Avenue Corp. v. Washington Co.,* 282 Or 591, 599, 581 P2d 50 (1978):

" 'The courts are finally responsible, but we believe that it is the Board itself, composed as it is of popularly elected local officials directly accountable to their constituency . . . that, in the first instance, should have the power and right to interpret local enactments. *Cf. Green v. Hayward,* 275 Or 693, 706, 552 P2d 815 (1976) (interpretation of county comprehensive plan).' "

agency's statutory assignment; though again, caution does not mean abdication.[6]

 (3) A third consideration, agency "expertise," generally relates to facts and to relations of past or predicted cause and effect in a particular field rather than to the interpretation of legal rules.[7] Expertise can relate to interpreting rules if their words have special or technical meaning. We distinguished "expertise" from delegation of a range of choice in *McPherson v. Employment Division,* 285 Or 541, 549-50, 591 P2d 1381 (1979):

> "Judicial respect for an agency's interpretation of a legal term, though it is a question of law, is often explained on a theory of agency 'expertise.' That may apply where statutory terms are drawn from a technical vocabulary which takes its meaning from a particular science, industry, trade or occupation in which the agency has genuine expertise, but an agency's administration of a specialized program does not mean that its political head or changing personnel either need or acquire expertise in that sense.* * * [T]he agency's special expertise calls for deference to 'the degree to which the problem involves knowledge peculiar to the industry, business, etc.,' * * *. *Rogers Construction Co. v. Hill,* 235 Or 352, 356, 384 P2d 219 (1963).
>
> "Distinct from such agency 'expertise' in giving meaning to a technical or specialized terminology is the question how far the statutory term entrusts to the agency some range of choice in carrying out the legislative policy. * * *"

Expertise is a characteristic of persons, not bestowed by appointment to office. If the responsible "agency," *see* ORS 183.310(1), is not itself composed of experts, the fact that it has experts on its staff is important only when decisions are delegated to them (in which case the expert becomes the "agency") or when experts participate in shaping institutional

---

 [6] Recognizing that each case always involves a delicate balancing of agency and judicial authority, Professor Arthur Bonfield points out that "[u]ltimately, the scope of review of agency rule making should accurately reflect the scope of the authority delegated to particular agencies to make rules, including the extent to which they were empowered to make various types of determinations on the basis of their own discretion." Bonfield, State Administrative Rule Making, 583 (1986).

 [7] *See, e.g., Dickinson v. Davis,* 277 Or 665, 674, 561 P2d 1019 (1977) (Public Utility Commissioner's reasons for predicted effect of sanctions, "when properly articulated, are entitled to the deference commonly accorded agency 'expertise' insofar as they reflect" matters within the commissioner's expertise).

decisions that do not require their expert testimony to be placed on a quasi-judicial record for ultimate decision by the lay agency. Specialization is not expertise, though it may produce expertise.

LCDC's claim of deference depends on what LCDC has done. *Compare Branscomb v. LCDC,* 297 Or 142, 145, 681 P2d 124 (1984) ("some deference" to LCDC's interpretation of its own rule), *with 1000 Friends of Oregon v. Wasco County Court,* 299 Or 344, 369, 703 P2d 207 (1985) (LCDC interpretation overturned as a *"de facto* amendment" of goal). The present case concerns the adequacy of a provision of Lane County's plan. The text under examination is Lane County's text, not that of a statute or of LCDC's goals or rules. If any interpretation is reviewed here, it is LCDC's view of how Lane County would interpret its ordinance, not how LCDC would interpret it. A future dispute about that interpretation would be appealed to LUBA, not to LCDC.

The "necessary and accessory" test incorporated in Lane County's LC 16.211(3)(b) originated in *Lamb v. Lane County,* 7 Or LUBA 137 (1983). In that case LUBA stated:

> "We understand petitioner to argue that Goal 4 prohibits uses not enumerated in Goal 4 unless the use is an essential part of one of the permitted, enumerated uses. In other words, unenumerated uses which are *necessary and accessory* to an enumerated forest use are permitted because they are, in effect, part of uses expressly authorized by Goal 4. For example, roads are not enumerated in Goal 4 as being an authorized use in lands zoned for forest uses. However, a logging road is a necessary accessory of commercial forestry production and would be permitted under petitioner's interpretation. We agree with that interpretation. Restrictions and conditions placed on unenumerated and accessory uses, such as buffering, are irrelevant because they fail to assure that forest lands are retained for the enumerated forest uses under this standard. Relevant conditions or restrictions would measure whether a use is, in fact, accessory." *Id.* at 143 (emphasis added).

Lane County and LCDC rely on the use of the italicized phrase in prior acknowledged plans to support the validity of its use in LC 16.211(3)(b). The Court of Appeals observed on reconsideration of this case, 85 Or App 619, 622, 737 P2d 975 (1987), that the county adopted the phrase as the sole criterion by which applications for building permits would be

judged and that Lane County was the first to so use the phrase.

The real issue is not the meaning of the words "necessary and accessory," however. Rather, it is whether LCDC erred in allowing Lane County to provide that existence of a forest management plan *ipso facto* allows construction of a dwelling or mobile home as being "necessary and accessory" to whatever the forest management plan may contain. Answering this question does not call for any form or version of judicial "deference" to agency action.

The relevant portion of LC 16.211(3)(b) provides:

"A dwelling or mobile home, and any accessory structures, on a vacant legal lot containing at least 10 acres *shall be deemed accessory and necessary* to the forest management of the legal lot provided:

"(i) A detailed forest management plan * * * is submitted for the legal lot which demonstrates forest production will be enhanced by on site forest management from the residence, and

"* * * * *

"* * * * *

"(iv) If the legal lot does not have a forest deferral pursuant to State law, then upon substantial completion of the details represented in the forest management [plan] in LC 16.211(3)(b)(i) above, the dwelling or mobile home shall be allowed on the property. Substantial completion of the details represented in the forest management plan shall be verified by a qualified private forestor and such verification shall be submitted in writing to the Department. During the interim, while the forest management plan is being implemented on the subject legal lot, a temporary mobile home in conjunction with the forest use shall be allowed for a period not to exceed five years. If the forest management plan is not implemented within the five-year period, the temporary mobile home shall be removed." (Emphasis added.)

In its acknowledgment order, LCDC based its finding of compliance with Goal 4 on Lane County's requirement of a forest management plan. LCDC stated that the requirements for a forest management plan and the Lane County ordinance making it a violation to fail to implement the plan "assures

that active forest management must occur on forest lands in order to establish a forest related dwelling; thus, satisfying the accessory and necessary test."

We do not believe that LCDC has adequately explained that conclusion. This court has set forth the minimum standards which are to be applied to agency articulations of policy in contested cases. "If an agency proceeds by an order in a contested case, * * * it must articulate a tenable basis for the legal conclusions by which it applies a statute to the facts." *Ross v. Springfield School District No. 19,* 300 Or 507, 517, 716 P2d 724 (1986). *See also Market Transport v. Maudlin,* 301 Or 727, 736-37, 725 P2d 914 (1986); *Ross v. Springfield School Dist. No. 19,* 294 Or 357, 370, 657 P2d 188 (1982); *Springfield Education Assn. v. Springfield School Dist, supra,* 290 Or at 228.

The present plan and acknowledgment order do not represent an articulation of a tenable basis for LCDC's application of Goal 4 to the facts of the plan. The order suggests that LCDC's legal conclusions are incorrect, but LCDC may be able to correct the record through a more extensive explanation of its reasoning so as to demonstrate the validity of the Lane County plan.

The key provisions in the Lane County plan concern the forest management plan. The language of the plan is such that if a landowner can file a proper forest management plan, the landowner can also construct a dwelling on forest land. This language raises questions unanswered in the acknowledgment order and leads to the conclusion that LCDC has not shown the plan to be in compliance with Goal 4.

The Court of Appeals held that while Lane County had adequately defined "accessory" as "[i]ncidental, appropriate and subordinate to the main use of a tract or structure," neither LCDC nor Lane County had defined "necessary." 83 Or App at 282. The Court of Appeals adopted Webster's Third New International Dictionary definition of "necessary": "that cannot be done without: that must be done or had: absolutely required," and held that "Lane County's criteria would allow dwellings which can be done without, need not be had and are not absolutely required for a forest use; they therefore do not comply with the goal." 83 Or App at 282-83. In their petitions to this court, all the parties objected to this ruling by the Court

of Appeals. Lane County and LCDC argued that the plan adequately defined the terms and that the Court of Appeals should have deferred to LCDC's judgment. 1000 Friends claimed that the Court of Appeals erred in approving the plan's definition of "accessory."

As already stated, the problem does not strike us as one of definition. The words "necessary" and "accessory" are not themselves part of Goal 4, the governing law. Although historic battles were fought over the meaning of "necessary" in the United States Constitution,[8] it is not really the meaning of the words on which the parties disagree here. Lane County's ordinance provides that buildings may be erected whenever the details of a forest management are completed. Therefore, the question is actually whether the standards for compliance with the forest management plan are such that LCDC can properly conclude that what would otherwise be a non-forest use—a dwelling—is, because of the forest management plan, properly considered a forest use.

In their petitions, LCDC and Lane County argue that because a forest management plan requires certain minimum stocking of timber, a forest management plan will comply with Goal 4. Because there must be some range between minimum stocking and the maximum possible forest density for most forest lands, a minimum stocking requirement does not itself ensure that the land will not be put to other uses. Therefore, applying a forest management plan to the lot as a whole would not seem to ensure that all the uses on the lot were forest uses as defined by Goal 4. LCDC has not shown how a non-forest use on one part of a lot, even one which enhances forest uses on other parts of the lot, must thereby legally be considered itself to be a forest use.

In ordinary usage, when the term "enhance" is used in reference to a condition, the usage implies that the basic conditions already exist and that the addition will improve or, as LCDC says in its petition, that there will be "an increment of increase." Without LCDC's offering a more extensive explanation, it does not appear that enhancing existing forest

---

[8] *McCulloch v. Maryland,* 17 US (4 Wheat) 316 (1819) (Congress could find a national bank "necessary" within the meaning of "necessary and proper" clause of the United States Constitution, Article I, section 8).

uses on part of a lot necessarily makes a non-forest use into a forest use.

LCDC asserts that the standards set forth in the Lane County plan are an adequate substitute for a case-by-case application of the "necessary and accessory" test to construction permit requests. This assertion is the heart of LCDC's legal conclusions. LCDC must show the necessary legal connection between the policy of conserving forest land for forest uses and allowing dwellings on forest land. Goal 4 sets a high standard when it requires that "[e]xisting forest uses shall be protected unless proposed changes are in conformance with the comprehensive plan." This court is not prepared to suggest that no dwelling could be considered necessary and accessory to a forest use, but we cannot agree that allowing a dwelling on some part of a lot simply because it may enhance forest uses on the remainder of the lot protects existing forest uses to the extent required by Goal 4.

The language of Goal 4 calls for a stringent standard here precisely because Lane County is seeking in its comprehensive plan to replace a case-by-case scrutiny of changes in forest use with the talisman of a forest management plan. Because LCDC has not shown that a dwelling's enhancement of a forest management plan is legally adequate to make construction of the dwelling automatically comply with Goal 4, the acknowledgment of the Lane County plan cannot be found to be in compliance with Goal 4.

The diligence of Lane County's authorities may, in effect, ensure there will be few impermissible intrusions of non-forest uses on forest land. However, the purpose of the review of a comprehensive plan is to ensure that the method now established to evaluate future changes is such that the goals are protected not only by the diligence of decision-makers, but also by the rules under which such future decisions are made. The "necessary and accessory" test in the Lane County plan is neither precise nor strict enough to show that dwellings on forest lands will meet the stated intent of Goal 4 to conserve forest lands for forest uses.

Lane County argues that because its plan, taken as a whole, does comply with Goal 4, a single, non-complying portion should not be subject to remand. Lane County misperceives the nature of the acknowledgment process and the roles

assigned to LCDC and to reviewing courts. ORS 197.650 directs that appeals of commission orders shall be "in the manner provided in ORS 183.482," which directs the court to remand the order to the agency if the agency's action is "[i]nconsistent with an agency rule, an officially stated agency position, or a prior agency practice." ORS 197.747 defines compliance with the goals for the purposes of acknowledgment under ORS 197.251 to mean that "the comprehensive plan and regulations, on the whole, conform with the purposes of the goals and any failure to meet individual goal requirements is technical or minor in nature."

The term "technical or minor" is a qualitative standard. In suggesting that its comprehensive plan should be approved as written because only a small portion of the total land area of Lane County is involved in the dispute over impacted forest lands, Lane County is attempting to make a qualitative measure into a quantitative measure. Such a suggestion misreads the language of ORS 197.747.

While other portions of the Lane County plan do comply with the goals, it is not a minor or technical violation of Goal 4 to allow non-forest uses, such as dwellings, on forest lands by simply showing that the non-forest uses will enhance certain forest uses. Compliance in other areas, even in other parts of the total forest use area, does not mean that Lane County can develop as part of its overall protection of Goal 4 a test which offers no assurance that non-forest uses which conflict with Goal 4 will not intrude on forest lands in some portion of the forest use zone. LCDC approval of this variation of the necessary and accessory test is inconsistent with the purpose of Goal 4.

Because there is not a sufficient showing in the record made by LCDC that the sole test in the Lane County plan used to evaluate dwellings on forest lands will protect Goal 4, the decision of the Court of Appeals on the first assignment of error is affirmed.

## FARM USES ON FOREST LANDS

The second assignment of error also concerns Goal 4 and the lands zoned by Lane County as impacted forest lands (F-2 lands). The issues in this question involve woodlot dwellings on forest land. LC 16.211(3)(c) permits:

"A dwelling or mobile home, and any accessory structures, in conjunction with the propagation or harvesting of a forest

product on a vacant lot that is managed as part of a woodlot meeting the Douglas-fir cubic foot site index and acreage requirements below, provided sufficient factual documentation concerning the forest management, the soils, cubic foot site indices and acreage of the legal lot is presented to verify that the legal lot meets the minimum cubic foot site index/ acreage requirements specified below. * * *"

Woodlots are included by *former* ORS 215.203(2)(b) (D) (now ORS 215.203 (2)(b)(H)) in exclusive farm use zones.[9] Although we find no specific legislative history on the subject, we infer that the legislature was referring to woodlots in the common sense of a small area where the landowner occasionally harvests trees for personal consumption or for sale as

---

[9] ORS 215.203(2)(b) (1985):

" 'Current employment' of land for farm use includes:

"* * * * *

"(D) Any land constituting a woodlot of less than 20 acres, contiguous to and owned by the owner of land specially valued at true cash value for farm use even if the land constituting the woodlot is not utilized in conjunction with farm use."

ORS 215.213 lists the permitted uses in exclusive farm use zones, including:

"(1) The following uses may be established in any area zoned for exclusive farm use:

"* * * * *

"(c) The propagation or harvesting of a forest product.

"* * * * *

"(2) The following uses may be established in any area zoned for exclusive farm use if the use meets reasonable standards adopted by the governing body:

"(a) A dwelling in conjunction with farm use or the propagation or harvesting of a forest product on a lot or parcel that is managed as part of a farm operation or woodlot if the farm operation or woodlot:

"(A) Consists of 20 or more acres; and

"(B) Is not smaller than the average farm or woodlot in the county producing at least $2,500 in annual gross income from the crops, livestock or forest products to be raised on the farm operation or woodlot.

"(b) A dwelling in conjunction with farm use or the propagation or harvesting of a forest product on a lot or parcel that is managed as part of a farm operation or woodlot smaller than required under paragraph (a) of this subsection, if the lot or parcel:

"(A) Has produced at least $10,000 in annual gross farm income in two consecutive calendar years out of the three calendar years before the year in which the application for the dwelling was made or is planted in perennials capable of producing upon harvest an average of at least $10,000 in annual gross income; or

"(B) Is a woodlot capable of producing an average over the growth cycle of $10,000 in gross annual income."

wood and not as a forest product. The separate acknowledgment of the "propagation or harvesting of a forest product" in ORS 215.213(1)(c) makes this view of woodlots more certain and demonstrates that as a legal term woodlots were not viewed by the legislature to be forest uses as well as farm uses.

Elsewhere in LC 16.211, Lane County provides for dwellings on agricultural land within the forest zone.[10] LCDC's and Lane County's responses to 1000 Friends' objections to LC 16.211(3)(c) make it clear that LCDC is acknowledging a comprehensive plan where what would otherwise be non-forest uses—woodlot dwellings—will be allowed on Goal 4 forest land because they are classified as meeting the requirements of Goal 3.

The Court of Appeals stated:

> "Lane County Development Code §§ 16.211(4)(k) and (l) permit woodlot homes on those properties within the F-2 zone that are in predominant agricultural use; 1000 Friends specifically agrees with that provision. It attacks the extension of the 'woodlot' dwelling exemption to those portions of the F-2 zone which would not by themselves qualify for EFU zoning. The code does not purport to require that the dwelling be necessary and accessory to a forest use, but only that the land meet certain fertility requirements and be managed for forest production. There is no attempt to show that forest production would require an on-site dwelling in every instance. If LCDC determined that the 'woodlot' dwelling provisions meet the requirements of Goal 4 for forest uses, it erred." 83 Or App at 284.

The question we address is whether Lane County may zone for and LCDC may acknowledge zoning which allows for exclusive farm uses on forest lands. Nothing in Goal 4 mentions farm uses as being compatible with the intent of the goal. However, LCDC mentions agricultural lands several times in its rules concerning Goal 4. OAR 660-06-000(3) states that

> "this rule provides for a balance between the application of

---

[10] LC § 16.211(4)(k) and (4)(l) permit woodlot dwellings on lots within the F-2 zone "in conjunction with farm use or the propagation or harvesting of a forest product on a legal lot that is managed as a part of a farm operation or woodlot." The language in these sections is similar to the language in ORS 215.213 concerning woodlot dwellings on agricultural land.

Goal 3 'Agricultural Lands' and Goal 4 'Forest Lands', because of the extent of lands that may be designated in either agricultural or forest land."

OAR 660-06-010 provides:

"The inventory [of forest lands] shall include land forested in commercial and noncommercial species and non-forested land suitable for forest uses, unless the non-forested land is inventoried as Goal 3 agricultural land * * *."

OAR 660-06-015(1) states:

"In areas of intermingled agricultural and forest lands, an 'Agricultural/Forest Lands' designation may also be appropriate."

These rules recognize that agricultural and forest uses may exist in such close proximity that it is impractical to create separate zones for each use. They cannot be read to amend the goals so that uses which are defined by Goal 3 as farm uses become Goal 4 forest uses. LCDC has the authority to adopt rules which interpret the goals. ORS 197.040(1)(b) and (c). Where the rules adopted by LCDC are reasonable interpretations of the goals, they will be recognized as such by this court. LCDC is not, however, given the authority to amend the goals through interpretation. *1000 Friends of Oregon v. Wasco County Court, supra,* 299 Or at 369.

LCDC seeks to merge Goal 4 into Goal 3, at least in areas of mixed farm and forest use. To justify this reinterpretation of the goals, LCDC first argues that the legislature did not explicitly direct the establishment of a forest goal. Later LCDC argues that "[b]ecause the legislature has adopted no exclusive forest use zone for forested lands, LCDC must determine which uses are permissible under Goal 4." Ignoring the fact that LCDC has set forth permissible forest uses in Goal 4, LCDC concludes that "[i]t is an appropriately circumscribed interpretation of what Goal 4 requires" for LCDC to permit a legislatively specified farm use on forest land. LCDC rejects the "surgical precision" of the Court of Appeals, because it claims that limiting "ORS 215.213(2) uses to land currently in farm use has no basis in ORS chapter 197." In sum, LCDC argues that it views Goal 4 forest uses and Goal 3 agricultural uses as interchangeable.

This abolition of any distinction between Goal 4 and

Goal 3 goes too far. When it created separate goals for agricultural use and for forest use, LCDC recognized that these uses had distinct characteristics. To suggest that land "may appropriately be converted from farm to forest use or vice versa depending on economic conditions and other factors," as LCDC now does in its petition to this court, blurs the distinction between Goal 4 and Goal 3. Nothing in the goals themselves, nor in the language of any statute, suggests that the goal can be thus reinterpreted.

ORS 197.340 directs that "[t]he commission, the department and local governments shall give the goals equal weight in the planning process." This court has held that Goal 3 and Goal 4 are analogous in their protection of Oregon's resources. *1000 Friends of Oregon v. LCDC (Curry Co.)*, 301 Or 447, 454, 724 P2d 268 (1986). Separate, analogous goals cannot be merged through reinterpretation. LCDC cannot by rule or policy statement amend the goals or reinterpret the goals to suggest that farm uses are also forest uses by concluding that because a use is allowed by Goal 3 it must also be allowed by Goal 4.

ORS 215.213(2)(a) and (b) speak of areas "zoned for exclusive farm use," and allow dwellings "in conjunction with farm use or the propagation or harvesting of a forest product on a lot or parcel that is managed as part of a farm operation or woodlot if the farm operation or woodlot" meets certain conditions. For LCDC to assert that this language allows it to conclude that all the farm and non-farm uses set forth in ORS 215.213 are also appropriate forest uses is unreasonable. The legislature specifically allowed the "propagation or harvesting of a forest product on a lot or parcel that is managed as part of a farm operation or woodlot." This legislative decision allowing a land use in exclusive farm use zones which could also be considered a forest use under Goal 4 does not thereby make those lands forest lands, nor does it mean that other farm uses are thereby allowed on forest lands.

■ If land is designated as Goal 4 land, all non-excepted uses must meet the requirements of Goal 4. Where there are mixed uses so closely or rationally connected that it is impractical to divide the land into exclusive Goal 3 or Goal 4 zones, the parties do not contest LCDC's decision that a mixed designation can be given to the zone as a whole. However, within

such a mixed use zone, and within an exclusive zone of either type, individual parcels cannot meet one goal merely by having a use corresponding to another goal. To be a forest use on forest land, the use must be compatible with and conducive to the retention and protection of forest land, and must be supported by findings in the record. LCDC acknowledged Lane County's plan despite the fact that it allowed farm uses on forest lands without a showing of compatibility with forest uses. In so doing, LCDC violated the requirements of Goal 4. The decision of the Court of Appeals is affirmed on the second assignment of error.

## THE SUBSTANTIAL EVIDENCE ISSUE

The parties next raise the question whether the Court of Appeals should use the substantial evidence test in reviewing acknowledgment decisions. The Court of Appeals was confronted with three questions which, taken together, raise the question of the proper standard of review of evidentiary questions in acknowledgment proceedings. These three questions were raised by assignments of error three, four and five. The first question concerned a challenge to the credibility of the evidence used to determine the minimum parcel sizes for the F-2 zone. The second question called upon the Court of Appeals to determine if there was substantial evidence in the record to support Lane County's determination of minimum lot sizes for the F-1 (non-impacted forest land) zone. The third question also involved a substantial evidence issue, but concerned the propriety of the use of tax lot information to determine the minimum lot size of lands within the Exclusive Farm Use (EFU) zone.

*Questioning the Credibility of the Evidence.*

■ In the first question, concerning the proper standard of review, 1000 Friends asserted that the "credible evidence in the record" did not support Lane County's conclusion regarding minimum parcel sizes on F-2 lands. The Court of Appeals affirmed LCDC's acknowledgment, stating: "We do not evaluate the *credibility* of the evidence," 83 Or App at 285 (emphasis in original), because, as the Court of Appeals had noted earlier, it "do[es] not review LCDC's findings *de novo,* as 1000 Friends appears to assume." *Id.* at 281 n 2. In its petition before this court, 1000 Friends argued that the Court of Appeals should have applied a substantial evidence test to

review the adequacy of LCDC's acknowledgment of the Lane County plan.

In other circumstances we might be more sympathetic to this argument. Questioning the credibility of the evidence can suggest a potential lack of substantial evidence to support a conclusion. However, in circumstances where an experienced appellate advocate argues that "the credible evidence in the record shows" that F-2 parcel sizes are too small, and in the very next paragraph argues that the minimum lot size in the F-1 zone is not supported by substantial evidence in the record, we are led to conclude, like the Court of Appeals, that what 1000 Friends is doing is inviting the court to agree that if 1000 Friends' opinions were followed, the results would have been different.

The record before the Court of Appeals suggests that 1000 Friends saw this assignment of error as a question concerning the interpretation of Goal 4 and not as an evidentiary question. In its petition to the Court of Appeals, 1000 Friends consolidated this assignment of error with the first two assignments of error concerning dwellings on forest lands, apparently viewing this claim as an attack on Lane County's F-2 (impacted) forest zone on the ground that the small lot size violated Goal 4 because such small lot sizes encouraged rather than discouraged conversion to non-forest uses. In its petition to this court, 1000 Friends changes its focus. It accepts the treatment of its assignment of error by the Court of Appeals as raising an evidentiary, rather than a Goal 4, question; but argues that the Court of Appeals wrongly answered the question it understood 1000 Friends to present. We disagree.

The Court of Appeals correctly held that it is not that court's responsibility to review the evidence *de novo,* as a fair reading of the argument by 1000 Friends suggests that that party was seeking. Neither is it that court's duty to supply arguments for the parties or answer questions which might have been but were not propounded. The decision of the Court of Appeals is affirmed on this question, the third assignment of error.

*Properly Applying the Substantial Evidence Test.*

1000 Friends also questioned the evidence offered by Lane County to support its 40-acre minimum lot size in the

F-1 (non-impacted forest lands) zone. As 1000 Friends argues, the requirement for minimum parcel sizes is important for compliance with the rural land use goals because it ensures that undersized parcels, which may not be economically viable for forest uses, do not produce pressures to rezone large areas of forest lands from F-1 to F-2 zoning. *See 1000 Friends of Oregon v. LCDC,* 69 Or App 717, 733-34, 688 P2d 103 (1984).

Judge Warden, writing for the Court of Appeals, properly applied the substantial evidence test and correctly found that some of the evidence offered by Lane County did not support the conclusion pertaining to minimum lot size. Further, the Court of Appeals found some of the evidence which was supportive lacked sufficient accompanying information to make it reasonable for Lane County or for LCDC to rely on this evidence.

The most important opinion evidence rejected by the Court of Appeals was contained in letters from a representative of the Lane County Land Owners Association stating that 40 acres could be an operationally and economically manageable forest unit. Lane County argues that these letters should have been given more weight because they represented the combined experience of the major timber producers in the county, and were not merely an expression of one opinion.

While Lane County may be correct factually, the evidence to support this assertion was not part of the record before LCDC or the Court of Appeals. There is nothing in the letter to indicate that the author or the association had background or evidence to support the assertions; the crucial sentence merely states that "it is our belief that a small parcel can be economically managed on a commercial basis." We agree with the Court of Appeals that LCDC did not have before it substantial evidence to support Lane County's findings. In other words, the evidence offered on this issue was not sufficient as a matter of law to support Lane County's findings.

■ The Court of Appeals correctly identified its responsibility to apply a substantial evidence test to decisions of LCDC when a challenge to the evidence has been properly raised. ORS 197.650 provides that decisions of LCDC shall be appealed to the Court of Appeals in the manner provided in ORS 183.482. ORS 183.482(8)(c) specifically states that "[t]he court shall set aside or remand the order if it finds that the

order is not supported by substantial evidence in the record." The language invoking ORS 183.482 was added to ORS 197.650 after this court held, in *Oregon Business Planning Council v. LCDC,* 290 Or 741, 626 P2d 350 (1981), that acknowledgment orders were subject to judicial review as orders in other than contested cases under ORS 183.484. In choosing to direct this court and the Court of Appeals to consider acknowledgment orders under ORS 183.482, the legislature deliberately chose a particular scope of review for courts reviewing acknowledgment orders.[11]

Lane County objects to the Court of Appeals' holding that there was insufficient evidence to support its determination of the minimum lot size for F-1 lands, arguing that the decision will turn quasi-legislative decisions into full-blown trials requiring sworn testimony, which would in turn inhibit compliance with Goal 1 (public participation). Lane County is not required to develop its record only on sworn testimony from witnesses, lay or expert, but the county cannot expect that any unsupported assertion that is entered in the record can be used to justify a planning decision.

Lane County is charged with complying with the goals in the development of comprehensive plans. ORS 197.250. In acknowledging a plan as being in compliance with the goals, LCDC must "[i]nclude a clear statement of findings in support of the determinations of compliance." ORS

---

[11] ORS 183.482(8) provides:

"(a) The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, it shall:

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law.

"(b) The court shall remand the order to the agency if it finds the agency's exercise of discretion to be:

"(A) Outside the range of discretion delegated to the agency by law;

"(B) Inconsistent with an agency rule, an officially stated agency position, or a prior agency practice, if the inconsistency is not explained by the agency; or

"(C) Otherwise in violation of a constitutional or statutory provision.

"(c) The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

197.251(5)(b). A comprehensive plan must be found to be in compliance, not merely alleged to be in compliance. Although admissibility in court is not the standard that should be used to judge the evidence that Lane County must present, to develop a comprehensive plan that is in compliance with the goals, and which can be found to be in compliance and affirmed on review, the county must make certain that the evidence presented to LCDC, "viewed as a whole, would permit a reasonable person to make that finding." ORS 183.483(8)(c). *See Younger v. City of Portland, supra.* The decision of the Court of Appeals on the fourth assignment of error is affirmed.

*The Evidence Used Must Be Connected With the Conclusions Reached.*

■ There are circumstances when the record contains large amounts of information offered in an attempt to support a conclusion, but a reviewing court may still find that there is insufficient evidence to support the conclusion. Lane County's findings concerning the minimum lot size for parcels in the EFU zone is an example of this problem.

Lane County inventoried all tax lots over 10 acres in the county to determine the minimum parcel size necessary before a farm could qualify for a farm dwelling. Based on that inventory, Lane County designated the largest parcels as being commercially significant and then compared these parcel sizes with the recommendations of agricultural extension agents to reach a final determination of the minimum parcel sizes for various types of farms in the county. Because the information derived from the tax lot survey was the basis against which all other evidence was evaluated and used, the correctness of the determination of minimum lot size ultimately rests upon the tax lot data.

The Court of Appeals held that Lane County and LCDC had erred in determining minimum lot sizes on EFU lands because Lane County relied on evidence of the size of tax lots to determine parcel size. The Court of Appeals stated: "If the county wishes to use this method, it must determine what the relationship between tax lots and actual worked area size is." 83 Or App at 290. The Court of Appeals was correct in its conclusion that Lane County's tax lots were not a proper basis to begin a determination of minimum lot size. LCDC did

not find that tax lots represent actual farms. There is no evidence that the size of one is relevant to the size of the other.

Goal 3 requires that: "Such minimum lot sizes as are utilized for any farm use zones shall be appropriate for the continuation of the existing commercial agricultural enterprise within the area." The actual size of commercial agricultural enterprises in the area may be smaller or larger than the tax lot survey which was the basis for the Lane County plan's minimum lot size and which formed the basis of the evidence before LCDC. Because there is no certain connection between tax lot size and actual farm size in the record, LCDC was incorrect when it assumed that using tax lots would ensure that actual farm uses are preserved.

LCDC has reached the same conclusions, although it apparently did not apply them in this case. OAR 660-05-015(7), concerning minimum lot sizes on Goal 3 lands, states:

"The minimum lot size standard in Goal 3 refers to an entire farm unit and should not be confused with individual tax lots. A single farm unit may consist of any number of contiguous tax lots (including tax lots separated only by a road or highway), which are managed jointly as a single farm unit. Inventories of tax lots are inappropriate because tax lots have little or no relationship to the operation of a commercial farm."

The substantial evidence test is not met by evidence that lacks a reasonable connection between the evidence and the conclusions which the evidence is designed to support. The decision of the Court of Appeals on the fifth assignment of error is affirmed.

## GOAL FIVE AND THE FOREST PRACTICES ACT

The Court of Appeals considered the issues in this case twice, including a response to the petitions for rehearing, *1000 Friends v. LCDC (Lane Co.)*, 85 Or App 619, 737 P2d 975 (1987). In both opinions, the Court of Appeals adhered to its interpretation of the land use planning system, which viewed the planning necessary to achieve Goal 5 as being unrelated to the Forest Practices Act (FPA), ORS 527.610 to 527.730.[12]

---

[12] Goal 5 concerns Open Spaces, Scenic and Historic Areas, and Natural Resources. It seeks "[t]o conserve open space and protect natural and scenic resources." The goal directs that:

"[p]rograms shall be provided that will (1) insure open space, (2) protect scenic and historic areas and natural resources for future generations, and (3) promote healthy and visually attractive environments in harmony with the natural landscape character."

During the time between the Court of Appeals' initial decision and its decision on rehearing, this court decided *1000 Friends of Oregon v. LCDC (Tillamook Co.)*, 303 Or 430, 737 P2d 607 (1987), holding that the FPA pre-empted continued county control of forested lands, including Goal 5 lands, once the county has determined that commercial timber operations will be permitted in a more than incidental way. While the petitions for rehearing were written before this court's decision in *Tillamook Co.*, the petitions by LCDC and Lane County did raise the question of the Court of Appeals' interpretation of Goal 5 and the FPA. Despite the requests of LCDC and Lane County in their petitions for rehearing for the Court of Appeals to reconsider its holding in this case as to Goal 5 and the FPA, which the Court of Appeals had decided based on its decision in *1000 Friends of Oregon v. LCDC (Tillamook Co.)*, 76 Or App 33, 708 P2d 370 (1986), *rev'd* 303 Or 430, 737 P2d 607 (1987), and despite the fact that prior to the Court of Appeals' decision on rehearing this court had reversed the Court of Appeals in *Tillamook Co.*, the Court of Appeals' decision on rehearing contains no mention of this reversal.

The Court of Appeals continued to adhere to its opinion in *Tillamook Co.*, which incorrectly held that nothing in ORS 527.722(1) modified a county's authority to maintain control over forested lands, even when the county had determined that commercial forest operations were more than an incidental use of the land. The issue in that case and the present case concerns whether a county can use the FPA and the administrative rules promulgated thereunder to satisfy Goal 5. In reversing the Court of Appeals, we held that "[n]othing in the text or context of ORS 527.722 or 527.726 suggests to us that a county is *foreclosed* from the option of reliance on the FPA in meeting the county's Goal 5 obligations." 303 Or at 440 (emphasis in original). Further, we held that the FPA pre-empts other management on lands where commercial forest operations are a primary use.

> "ORS 527.722 prohibits counties from adopting any rules or regulations regulating commercial forest operations governed by the FPA. The only exception to this rule arises when an area is zoned for a primary use other than commercial forest operations. ORS 527.726(1)(c). * * *" *Id.* at 441.

In the present case, Lane County properly relied on the FPA and the rules to be promulgated thereunder by the

State Board of Forestry to meet its Goal 5 obligations on forested lands where commercial forest operations are a primary use.

For the reasons set forth in our decision in *Tillamook Co.*, the Court of Appeals' decision on the sixth assignment of error is reversed.

## COMMITTED EXCEPTIONS

The last assignment of error concerns 1000 Friends' objection to many committed exceptions in the Lane County plan. 1000 Friends objected to the exceptions by Lane County, arguing that the county had failed to provide sufficient information to demonstrate that the exceptions met the criteria of ORS 197.732 and the related rules. The Court of Appeals held that Lane County failed to find how current land use patterns came about and failed to show the relationship between the goals and that development:

> "[I]n order to justify a committed exception, the county must discuss how the current land use patterns came about and the relationship between the goals and that development. * * * We recognize that the large number of exceptions requires, as a practical matter, that the county attempt to justify each one in a summary fashion. However, it must still show compliance with ORS 197.732 and the administrative rules." 83 Or App at 290, 291 n 14.

The exceptions process has resulted in much litigation and argument concerning the burden for justifying committed exceptions. ORS 197.350(2) states that "[a] local government that claims an exception to a goal adopted by the commission has the burden of persuasion."[13] The Court of

---

[13] Although not applicable to administrative proceedings (OEC 101(1)(2)), Oregon Rule of Evidence 305 uses and defines "burden of persuasion":

"A party has the burden of persuasion as to each fact the existence or nonexistence of which the law declares essential to the claim * * * the party is asserting."

The commentary notes:

" '[B]urden of persuasion' means the obligation of a party to produce a particular conviction in the mind of the trier of fact as to the existence or nonexistence of a fact. If the requisite degree of conviction is not achieved, the trier of fact must assume that the fact does not exist.

"* * * * *

"* * * A party that has the burden of persuasion must persuade the trier of fact that an alleged fact is true. Logically prior to this, however, the same party has the

Appeals and this court have consistently held that a county has the burden to demonstrate the validity of its exceptions. *See, e.g., Curry Co.,* 301 Or at 513-15. However, LCDC and the planning bodies continue to allege that objectors are not carrying their share of the planning process burden. In the present case Lane County argues that 1000 Friends' general objections did not give it an opportunity to make corrections or prepare a defense.[14]

The act of designating an area to be within a certain land use zone defined by the goals represents a land use decision that the land within that area will be used to meet a particular goal. Committed exceptions are an inevitable and necessary part of developing a comprehensive plan. They give comprehensive planning flexibility by recognizing that past actions may have so altered the planned use on certain parcels that these parcels cannot completely meet the goal which would otherwise apply.

Goal 2 provides that the exceptions process is "applicable to specific properties." ORS 197.732(4) requires that "[a] local government approving or denying a proposed exception shall set forth findings of fact and a statement of

---

burden of producing sufficient evidence for the court to find that the trier of fact would be reasonable in so finding. To carry the burden of persuasion, a party must have already satisfied the burden of producing evidence * * *."

ORS 197.350(3) provides "there shall be no burden of proof in administrative proceedings under ORS chapters 196 and 197."

[14] Lane County seeks to have its exceptions accepted unless the objectors can point to specific defects. In its petition, Lane County argues:

"Fundamental fairness dictates that both the affected county and LCDC have a basis to review the objections and know what is being challenged. When this happens, the parties can then elect to make corrections or prepare a defense on the merits. Here, 1000 Friends generalized challenge prevented both Lane County and LCDC from doing so before the Court of Appeals. Lane County did attempt a defense on the merits, but, because the challenge was so general, it did not even know of the issue ultimately used by the court to reject the exceptions. *This is not fair!* Furthermore, application of this policy will only lead to continued litigation. If the Court of Appeals decision is not reversed, how does [sic] LCDC and Lane County cure the defect? Should the County only address the minor technical problem cited by the court, or because 1000 Friends has objected to all the exceptions, does it have a hunting license to attack any or all exceptions for reasons not ever raised before?" (Emphasis in original.)

After Lane County has corrected the record, so that the record adequately supports each exception taken, 1000 Friends and other objectors will be able to, and must, list any specific exceptions where they can show that the record does not support the exceptions taken. However, until the county supplies a complete record, such objections are meaningless.

reasons which demonstrate that the standards of [ORS 197.732(1)] have or have not been met," and ORS 197.732(6)(a) provides that on review the "board or the commission shall be bound by any finding of fact for which there is substantial evidence in the record of the local government proceeding."

 ORS 197.732(1)(b) provides:

"A local government may adopt an exception to a goal when:

"* * * * *

"(b) The land subject to the exception is irrevocably committed as described by commission rule to uses not allowed by the applicable goal because existing adjacent uses and other relevant factors make uses allowed by the applicable goal impracticable."

This exceptions process exists to accommodate the past and the present in fulfilling the purpose of land use planning to control uncoordinated development. ORS 197.005. Past uncoordinated development necessitates the exceptions process. Committed exceptions are not designed as a vehicle for accommodating future growth. Therefore, to justify an exception, local government must demonstrate that the particular parcel in question has already been developed to such an extent that it cannot now meet the applicable goal, or that the surrounding area has been similarly developed so that a proper use of this parcel to meet the goal is impractical. If an exception in a comprehensive plan is acknowledged with insufficient evidence in the record, LCDC has failed to fulfill its responsibilities under ORS 197.732(6). An objector has done all it need do if, as described in *Curry Co.*, 301 Or at 514, it has placed in the record a complete list of the exceptions areas to which it objects, described the types of factual and legal deficiencies upon which it bases its objections, and gives examples of areas where each type of deficiency allegedly exists.[15]

---

[15] In *1000 Friends of Oregon v. LCDC (Curry Co.)*, 301 Or 447, 514, 724 P2d 268 (1986), this court recognized that there are two types of objections that can be raised to the exceptions process, and set forth the burden on an objector. Discussing 1000 Friends' objections, this court said:

"The first three grounds for objection went to the underlying basis for all the

■ On the other hand, an objector cannot proceed through the entire acknowledgment process only stating a general objection to all exceptions, and then successfully prosecute judicial review of a specific exception on specific grounds. Only an objection to a county's exceptions process, rather than to the results, is preserved by a general objection. If the exceptions process is improper such a general objection may be valid and must be addressed. However, once a proper method of determining exceptions has been set out and approved by the planning body, the objector must make specific objections as to each parcel.

In the present case, Lane County has not demonstrated in the record proper exceptions for the use of nonconforming parcels. Lane County objects to LCDC's requirements in OAR 660-04-028(6)(c)(A) that the county's findings address how the land use patterns evolved and their present relationship to the goals.[16] Lane County suggests that this is

---

exceptions. As to the fourth and fifth grounds, 1000 Friends specified both in its objection letter in the record and in its brief examples of areas where the alleged deficiencies existed.

"1000 Friends met its burden as objector because it (1) placed in the record a complete list of the exceptions areas to which it objected; (2) described the types of factual and legal deficiencies upon which it based the objections; and (3) gave examples of areas where each type of deficiency allegedly existed. An objector who does these things gives the local government a sufficient opportunity to respond, gives LCDC an opportunity to resolve the issues, and if it summarizes the arguments and cites to the record on appeal, gives the court a basis for identifying and resolving contested issues. A court which demands that objectors do more before it will consider their arguments imposes an improper burden on objectors and, more importantly, implies that LCDC can disregard its duty to 'make its independent determination' of a local government's compliance as to all portions of a plan which objectors do not contest."

In the present case, 1000 Friends met its burden because it raised legitimate and proper questions concerning the method whereby Lane County supported its exceptions. The method of documentation used by Lane County and acknowledged by LCDC was not in compliance with the statutory requirements or the rules of LCDC. Objection to the method does not require specific objection to any particular exception, because an improper methodology calls all exceptions into question. Just as it is not important that some tax lots correspond to actual farms when the challenge is to the basic decision to use tax lot information to determine minimum parcel size, that some exceptions may have supplied the necessary information is not relevant to a challenge to the validity of the basic method of documenting exceptions. Serendipitous compliance may make compliance on remand much easier, but it does not alter the requirement that all exceptions must be properly documented before an objector is called upon to make specific objections to specific exceptions.

[16] In its petition, Lane County discusses OAR 660-14-028(2)(c)(A), a rule which is not in the copy of the Oregon Administrative Rules available to this court. From the

an "absurd, irrelevant requirement," at best only duplicating the statutory requirement that the land be irrevocably committed to non-resource use.

We do not read the requirements of OAR 660-04-028(6)(c)(A) as being either duplicative of the requirements of ORS 197.732(1)(b) or irrelevant. The rule uses the term "irrevocable commitment." One of the best methods to demonstrate objectively an irrevocable commitment is through a demonstration that the history of a certain plot is such that uses recognized by the relevant goal have ceased to be practical. Such a demonstration shows that a parcel is irrevocably committed, and the rule is a logical expression of the requirements of the statute. The decision of the Court of Appeals on the last assignment of error is affirmed.

On remand Lane County must demonstrate that the

context of its discussion, we take Lane County to be referring to OAR 660-04-028(6), which provides:

"Findings of fact for a committed exception shall address the following factors:

"(a) Existing adjacent uses;

"(b) Existing public facilities and services (water and sewer lines, etc.);

"(c) Parcel size and ownership patterns of the exception area and adjacent lands:

"(A) Consideration of parcel size and ownership patterns under subsection (6)(c) of this rule shall include an analysis of how the existing development pattern came about and whether findings against the Goals were made at the time of partitioning or subdivision. Past land divisions made without application of the Goals do not in themselves demonstrate irrevocable commitment of the exception area. Only if development (e.g., physical improvements such as roads and underground facilities) on the resulting parcels or other factors make unsuitable their resource use or the resource use of nearby lands can the parcels be considered to be irrevocably committed. Resource and non-resource parcels created pursuant to the applicable goals shall not be used to justify a committed exception. For example, the presence of several parcels created for non-farm dwellings or an intensive commercial agricultural operation under the provisions of an exclusive farm use zone cannot be used to justify a committed exception for land adjoining those parcels.

"(B) Existing parcel sizes and contiguous ownerships shall be considered together in relation to the land's actual use. For example, several contiguous undeveloped parcels (including parcels separated only by a road or highway) under one ownership shall be considered as one farm or forest operation. The mere fact that small parcels exist does not in itself constitute irrevocable commitment. Small parcels in separate ownerships are more likely to be irrevocably committed if the parcels are developed, clustered in a large group or clustered around a road designed to serve these parcels. Small parcels in separate ownerships are not likely to be irrevocably committed if they stand alone amidst larger farm or forest operations, or are buffered from such operations."

area around parcels of land that qualify for the irrevocably committed exception have a history of past and present uses which together demonstrate that uses allowed by the applicable goal are impractical. Once Lane County has demonstrated this, it may develop a new listing of exceptions if these are supported by evidence in the record.

## COSTS AND ATTORNEY FEES

1000 Friends petitioned this court for review of the denial of costs and attorney fees by the Court of Appeals. 1000 Friends argued that it was eligible for fees and costs under either the mandatory provisions of ORS 183.497(1)(b) or the discretionary provisions of ORS 183.497(1)(a).[17] We affirm the decision of the Court of Appeals.

In its petition 1000 Friends assumes without showing that ORS 183.497 applies to proceedings involving LCDC. Because this is an invalid assumption, we reject 1000 Friends' argument concerning the application of ORS 183.497.

Some portions of Oregon's Administrative Procedures Act, ORS 183.025 to 183.725, are applicable to the decisions of LCDC, but LCDC is not thereby brought entirely within the provisions of the APA. Some portions of ORS chapter 197, governing LCDC and appeals from LCDC decisions, have their own provisions which may parallel but are not within the APA.

LCDC rulemaking is expressly within the APA under

---

[17] ORS 183.497 provides:

"(1) In a judicial proceeding designated under subsection (2) of this section the court:

"(a) May, in its discretion, allow a petitioner reasonable attorney fees and costs if the court finds in favor of the petitioner.

"(b) Shall allow a petitioner reasonable attorney fees and costs if the court finds in favor of the petitioner and determines that the state agency acted without a reasonable basis in fact or in law; but the court may withhold all or part of the attorney fees from any allowance to a petitioner if the court finds that the state agency has proved that its action was substantially justified or that special circumstances exist that make the allowance of all or part of the attorney fees unjust."

the terms of ORS 197.040(1)(b) and (c).[18] ORS 197.040(1)(c) places LCDC's adoption of goals outside the APA. In other sections the legislature has distinguished between full application of the APA and a partial application of the Act. ORS 197.320(3), concerning commission orders to local governments, state agencies or special districts directing these entities to comply with the goals, states that "[t]he hearing and judicial review of a final order shall be governed by the provisions of ORS 183.310 to 183.550 applicable to contested cases except as otherwise stated in this section." ORS 197.650, which is the applicable statute for the appeal in this case, includes less of the APA. The statute merely provides that "[a] commission order may be appealed to the Court of Appeals in the manner provided in ORS 183.482."

ORS 197.650 was not added to chapter 197 in an attempt to bring the entire acknowledgment review process under the APA. This section of chapter 197 was added in 1981 after this court's decision in *Oregon Business Planning Council v. LCDC,* 290 Or 741, 626 P2d 350 (1981), which held that acknowledgments should be considered orders in other than contested cases for purposes of appeal. At that time the legislature was considering HB 2225 which amended chapter 197 in several respects to assist LCDC in completing the acknowledgment process and provided for "an orderly system of land use planning for the postacknowledgment era." Section 10 of the bill became ORS 197.650. The language of ORS 197.650 is not an indication that all of the APA is to apply to acknowledgment reviews. The language appears deliberately chosen to use portions of the APA as a model without thereby applying all of the provisions of the APA.

ORS chapter 197 contains separate language concerning the costs of appealing LCDC decisions and serves as a further indication that the provisions of the APA do not

---

[18] ORS 197.040(1) provides in relevant part:

"The commission shall:

"* * * * *

"(b) In accordance with the provisions of ORS 183.310 to 183.550, adopt rules that it considers necessary to carry out ORS chapters 196 and 197. * * *

"(c) Adopt by rule in accordance with ORS 183.310 to 183.550 or by goal under ORS chapters 196 and 197 any state-wide land use policies that it considers necessary to carry out ORS chapters 196 and 197. * * *"

apply. The history of the development of the separate cost provisions illustrates that the legislature has had several opportunities to combine the provisions if it so intended, but instead has continued to treat each provision separately.

*Former* ORS 197.330(1) was adopted in 1973 as part of the original ORS chapter 197 and provided:

> "Whenever the commission prescribes a comprehensive plan or zoning, subdivision or other ordinances or regulations for lands described in subsection (1) of ORS 197.325, the costs incurred by the commission and the department in the preparation and administration of such plan or ordinances or regulations shall be borne by the city or county for which the commission has proposed such plan or ordinances or regulations. * * *"

After the passage of ORS 197.330(1), the Oregon legislature amended the APA by Oregon Laws 1975, chapter 759, section 16a, *codified as former* ORS 183.495:

> "Upon judicial review of a final order of an agency when the reviewing court reverses or remands the order it may, in its discretion, award costs, including reasonable attorney fees, to the petitioner to be paid from funds appropriated to the agency."

This change in the APA, as amended in 1981 and replaced in 1985 by ORS 183.497, was the origin of the provision for attorney fees and costs in the APA. It came at the midpoint of the changes in ORS chapter 197 concerning fees.

ORS 197.330 was repealed by Oregon Laws 1977, chapter 664, section 42. Later in the same session, ORS 197.265 was adopted. Subsection (2) provides:

> "If any action is brought against a local government challenging any comprehensive plan, land use regulation or other action of the local government which was adopted or taken for the primary purpose of complying with the goals approved under ORS 197.240 and which does in fact comply with the goals, then the commission shall pay reasonable attorney fees and court costs incurred by such local government in the action or suit including any appeal * * *."

A brief examination of the legislative history of these bills does not indicate that the legislature intended the attorney fees provisions of ORS chapter 183 to apply to the present action. *Former* ORS 183.495 was offered as an amendment to

HB 2068 (which made major changes in the APA) by the Attorney General's Office on the last day of hearings before the Senate Committee on the Judiciary. The amendment was accepted on the Attorney General's explanation that the state should be assessed attorney fees in those few cases where an agency had been arbitrary in its actions. Minutes, Senate Committee on Judiciary (June 11, 1975).

ORS 183.497 was originally offered in 1979 by small business advocates. After failing to get out of conference that year, the bill was reintroduced in 1981. The discussion of the bill in the Senate Justice Committee primarily concerned fines and license denials by state agencies. The term "small business" was replaced by "petitioner" after the committee discussed the difficulty in determining who or what constituted a small business. Minutes, Senate Justice Committee (May 6, 1981).

This discussion is set forth here not to indicate the limits of these statutes, but to indicate that their origins do not suggest that the legislature contemplated inclusion of judicial review of acknowledgment orders within the provisions of these statutes. On the other hand, there is some indication that the legislature was aware that the provisions of ORS 197.265 did not provide fees and costs for both sides. Testifying in opposition to the proposed bill before the Policy Subcommittee of the Joint Legislative Committee on Ways and Means, Audrey Jackson of the League of Women Voters pointed out that the bill was uneven in its application, in that it made no provisions for payment to the "people who suffer from goal violations by cities and counties." Minutes, Joint Legislative Committee on Ways and Means (June 22, 1977). Despite this protest, the Joint Committee passed the bill out with a "do pass" recommendation and it was passed by the House.

Nothing in ORS chapter 197 concerning appeals of acknowledgment orders suggests that the legislature intended ORS 183.497(1)(a) or (b) to apply to objectors in acknowledgment cases. The legislature has, however, shown that it did not wish all of the APA to apply to land use cases. Therefore, in the absence of a more explicit declaration that the legislature wishes to allow objectors an opportunity to be reimbursed

for their efforts, the decision of the Court of Appeals denying petitioner costs and attorney fees is affirmed.

The decisions of the Court of Appeals and LCDC are reversed in part and affirmed in part. The case is remanded to LCDC for further proceedings consistent with this opinion.