## WILLIE ALEXANDER,
*Petitioner,*

*v.*

## OREGON STATE PENITENTIARY,
*Respondent.*

(A-5-88-091; CA A49303)

783 P2d 1034

Steven H. Gorham, Salem, argued the cause and filed the brief for petitioner.

John A. Reuling, Jr., Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

EDMONDS, J.

Rossman, J., dissenting.

## EDMONDS, J.

Petitioner seeks review of an order of the Superintendent of the Oregon State Penitentiary finding him guilty of violations of disciplinary rules. OAR 291-105-015. He makes several assignments of error.[1] We reverse and remand.

Petitioner, an inmate of OSP, was assigned to the Prison Farm Annex. With another inmate, he left the prison without authorization and held up a convenience store. The two assaulted the store clerk and stole money, beer and the clerk's personal possessions. After petitioner was arrested and returned to OSP, a hearings officer made findings and determined that petitioner had violated certain disciplinary rules.[2] As a result of the violations, the Superintendent imposed sanctions. Petitioner argues that, because his conduct occurred while he was on escape status, the Superintendent did not have the authority to impose sanctions.

ORS 421.180 provides:

"The Department of Corrections by rule shall adopt procedures to be utilized in disciplining persons committed to the physical and legal custody of the department."

---

[1] We address only the issue of whether the Superintendent had the authority to impose sanctions for conduct that occurred outside the prison annex. Petitioner's other assignments of error do not merit discussion.

[2] The hearings officer made these conclusions:

"1. Inmate Alexander violated Rule 3 by being, without Department of Corrections authorization, in areas of Salem, Oregon not under the jurisdiction of the Department of Corrections between the period of 7:15 p.m. on 5/1/88 to 5/4/88.

"2. Inmate Alexander did not violate Rule 6 in that his state-issued clothing was seized by the Salem Police Department.

"3. Inmate Alexander violated Rule 13(4) in that he, by his conduct on 5/1/88, entered an agreement with Inmate Peacock to rob the Plaid Pantry store located at 2797 12th Street S.E. in Salem, Oregon on 5/1/88.

"4. Inmate Alexander violated Rule 5 by possessing without Department of Corrections authorization an artificial diamond ring (cubic zirconia), and keys belonging to Evans and Evans' car during the period from 7:15 p.m. on 5/1/88 to 5/4/88.

"5. Inmate Alexander violated Rule 7(f) by possessing without Department of Corrections authorization money from the Plaid Pantry Store cash register under the control of Evans during the period from 7:15 p.m. on 5/1/88 to 5/4/88.

"6. Inmate Alexander violated Rule 7(g) by possessing without Department of Corrections authorization beer an intoxicant on 5/1/88.

"7. I decline to consider the charge of violating Rule 14(4) for the reason that its violation would merge with the violation of Rule 13(4)."

Pursuant to the authority of that statute, the Department of Corrections promulgated OAR 291-105-005 *et seq.* Those rules provide, in relevant part:

OAR 291-105-005:

"(2) Purpose. The purpose of this rule is to define the rules of conduct covering inmates and outline the procedures to be followed in processing disciplinary action.

"(3) Policy. It is the policy of the Department of Corrections that specific rules of conduct describing acceptable behavior standards will be established and precise procedural processes will be outlined to insure [*sic*] that both staff and inmates understand what behavior is unacceptable, how misconduct reports will be processed and what sanctions can legitimately be imposed. Staff are required to be thoroughly familiar with the disciplinary process."

OAR 291-105-010:

"(9) 'Inmate': Any person under the supervision of the Department of Corrections who is not on parole or probation status."

OAR 291-105-015:

"(3) Unauthorized Area: No inmate shall be in any location not designated by assignment, programmed activity, callout or staff directive.

"* * * * *

"(5) Unauthorized Possession of Property: No inmate shall knowingly possess property without staff authorization, in accordance with the Departmnet of Corrections rules on Personal Property (Inmate) (OAR 291-117-005 to 291-117-020).

"* * * * *

"(7) Possession, Manufacture, or Use of Dangerous Contraband: Except as may be authorized by other rules, no inmate shall knowingly possess, manufacture or use:

"* * * * *

"(f) Money including negotiable instruments and uncancelled stamps;

"(g) Intoxicants[.]"

The issue is whether those rules apply to the actions of a person while on escape status. The requirement in ORS

421.180 that the Department adopt procedures to use in disciplining persons "committed to the physical and legal custody of the department" appears to provide a broad definition of those to whom the rules apply. However, that statute authorizes the adoption of rules regulating Department procedure, not inmate conduct.

Whether or not the Department could adopt rules that would permit disciplining an inmate for conduct while on escape status, we conclude that it has not done so. The statements of purpose and policy in OAR 291-105-005, show that the Department's intent is to protect inmates from each other and to promote the safe internal operation of the state's correctional facilities. The rules cover persons who "are under the supervision of the Department of Corrections" other than on parole or probation status. OAR 291-105-010(9). Nothing in them expresses an intent to govern conduct that occurs outside of the Department's supervision.[3]

The state argues that "custody," as intended by ORS 421.180, means more than mere physical control and that prisoners temporarily outside their usual place of confinement for limited purposes are still in the custody of the penal institution in which they were previously confined. It relies on *Shobe v. OWCC,* 28 Or App 657, 560 P2d 676, *rev den* 278 Or 393 (1977), where an inmate of the Women's Correctional Center sought review of a finding that she had violated a disciplinary rule. At the time of the alleged violation, she had been administratively transferred to the Oregon State Hospital without statutory authorization. She argued that the lack of authorization deprived OWCC of authority to impose a sanction for a violation that occurred at the hospital. We disagreed, holding that the unauthorized transfer to the hospital did not terminate the Department's authority over the inmate. Unlike petitioner, Shobe did not leave the Department's supervision while she was at the hospital.

The dissent would hold that petitioner continued to be "under the supervision of the Department of Corrections" while on escape status. Actual supervision of the petitioner at

---

[3] For instance, the rules prohibit unauthorized organizations, sexual activity, disrespect to others, disobedience of an order, gambling and giving false information to staff members. *See* OAR 291-105-015.

that time was a physical impossibility. By their terms, OAR 291-105-005 *et seq* do not purport to govern inmate conduct by constructive supervision.[4]

We reverse the findings that petitioner violated Rules 5, 7(f) and (g), because the conduct on which those findings are based occurred after he left the Department's supervision. We remand for further findings on whether petitioner violated Rules 3 and 13(4). The hearings officer's findings do not show whether the conspiracy to commit the assault and robbery occurred while petitioner was under the Department's supervision. If it occurred before his escape, the Superintendent had authority to impose sanctions for it, but he did not, if it occurred afterwards. Petitioner could be guilty of a Rule 3 violation while in the process of escaping, but the hearings officer's findings suggest that he found petitioner guilty only because he was in an unauthorized area after he had left the Department's supervision.[5]

---

[4] The dissent asserts that the rules do express an intent to govern conduct that occurs outside the institution and points to rules which apply to inmates on temporary leave and work release. Contrary to the dissent's suggestion, what those rules do is to demonstrate the exercise of the Department's authority to make rules regarding inmates over whom they have constructive supervision. The lack of specific rules covering conduct of inmates on escape status supports the proposition that, although the Department may have the authority to promulgate rules regarding escaped inmates, it has not done so.

Those cases that have discussed constructive custody, as distinguished from constructive supervision, have done so in the context of ORS 162.135(3) and (4), which provide:

"(3) 'Custody' means the imposition of actual or constructive restraint by a peace officer pursuant to an arrest or court order, but does not include detention in a correctional facility, juvenile facility or a state hospital.

"(4) 'Escape' means the unlawful departure, including failure to return to custody after temporary leave granted for a specific purpose of limited period, of a person from custody or a correctional facility but does not include failure to comply with provisions of a conditional release in ORS 135.245."

The definition of "custody" in that context refers expressly to both actual and constructive restraint, unlike OAR 291-105-005 *et seq. See State v. Hutcheson,* 251 Or 589, 447 P2d 92 (1968); *State v. Ratliff,* 89 Or App 483, 749 P2d 616 (1988); *State v. Dillenburg,* 49 Or App 911, 621 P2d 1193 (1980).

[5] Although the Department does not raise the issue, we have considered whether its action in disciplining petitioner was a determination that its rules apply to conduct occurring after an escape and, if so, whether we should defer to the Department's interpretation of its own rules. However, nothing in the Department's order discusses the scope of the rules. The ultimate determination of that legal issue is for the courts and, without a considered agency discussion of the point, there is nothing to which we might defer. *See 1000 Friends of Oregon v. LCDC (Lane Co.),* 305 Or 384, 389-392, 752 P2d 271 (1988).

Reversed as to violations of Rules 5, 7(f) and (g); remanded for reconsideration of alleged Rule 3 and 13(4) violations and for reconsideration of sanctions.

**ROSSMAN, J., dissenting.**

The majority concludes that, if an escaped prisoner violates the Department's rules of conduct while he is outside the walls of the institution, he cannot be punished for those violations. By so holding, the majority permits this inmate to author his own justice. Because I believe that the rules do cover petitioner's misconduct, I respectfully dissent.

This court previously has addressed the circumstances under which an individual is subject to the Correction Division's rules of conduct. In *Shobe v. OWCC,* 28 Or App 657, 660, 560 P2d 676, *rev den* 278 Or 393 (1977), we stated the rule:

> "The Corrections Division is authorized to adopt procedures to be utilized in disciplining persons committed to the physical and legal custody of the division. ORS 421.180. The Corrections Division and OWCC have adopted Major Rules of Conduct pursuant to ORS 421.180 and *unless the petitioner can establish that she was not in the legal custody of the Corrections Division or OWCC,* she is subject to the rules." (Emphasis supplied.)

We noted:

> " 'The word "custody" does not always mean the same thing. An officer or agency may have physical custody separate and apart from, or in combination with, the legal custody of a different officer or agency. The term is elastic and may mean actual imprisonment or other physical detention, or it may refer to mere power, legal or physical, of imprisoning or of taking manual possession. * * *.' *Kneefe v. Sullivan,* 2 Or App 152, 155, 465 P2d 741, Sup Ct *review denied* (1970)." 28 Or App at 660.

Despite his escape, petitioner remained in the *legal* custody of the Department. It follows that he was subject to its disciplinary rules.

Contrary to the majority's suggestion, the rules *do* express an intent to govern conduct that occurs outside the institution. OAR 291-105-005(2) states: "The purpose of this rule is to define the rules of conduct governing *inmates* * * *." (Emphasis supplied.) OAR 291-105-010(9) specifically defines

an "inmate" as "[a]ny person under the supervision of the Department of Corrections who is not on parole or probation status." Thus, if petitioner continued to be under the Department's supervision, either actually or constructively, the rules covered his conduct, despite his escape.

The majority concludes, without explanation, that "OAR 291-105-005 *et seq* do not purport to govern inmate conduct outside the Department's actual supervision by constructive supervision." 99 Or App at 664.[1] That simply is not the case. By their terms, the rules apply to inmates on "Short-Term Temporary Leave." *See* OAR 291-105-010(14). They also apply to persons in the work release program. *See* ORS 144.490(2);[2] *State v. Hutcheson,* 251 Or 589, 592, 447 P2d 92 (1968). Because inmates in those situations are not always under the actual supervision of the Department, the term "supervision" within the meaning of OAR 291-105-005 *et seq* must include constructive supervision.

Following the majority's analysis to its logical conclusion, a prisoner who breaks a disciplinary rule while on work release and returns on time is subject to the disciplinary rules, while one who commits the same misconduct and never returns on his own is not. Neither the statutes nor the rules require that result.[3] " '[A]n inmate is considered confined within a "correctional facility" from time of original commitment until *lawfully* discharged.' " *State v. Dillenburg,* 49 Or App 911, 916, 621 P2d 1193 (1980) (*quoting* Criminal Law Revision Commission, *Proposed Criminal Code, Final Draft* 94.) (Emphasis supplied.) Because defendant was never lawfully discharged, he remained under the Department's supervision and was subject to its rules.

---

[1] Given our broad construction of the term "custody," there is no reason to give "supervision" the majority's very narrow meaning. To "supervise" means, *inter alia,* "to superintend"; in turn, "to superintend" means, *inter alia,* "To have charge and direction of; * * * to regulate with authority." *Black's Law Dictionary* 1606-07 (revised 4th ed 1968). The notion of constructive supervision fits within those definitions.

[2] ORS 144.490(2) provides:

"For purposes of this chapter, a person enrolled in the work release program established under ORS 144.420 is considered to be an inmate of a Department of Corrections institution."

[3] Nothing in the rules states that their purposes are *solely* "to protect inmates from each other and to promote the safe internal operation of the state's correctional facilities." 99 Or App at 663. Rather, their stated policy is broad—"to insure that both staff and inmates understand *what behavior is unacceptable.*" OAR 291-105-005(3).

In short, we should not reward petitioner for escaping. An inmate does not run away from the rules by running away from the prison. I believe that the Department's disciplinary rules apply to inmates who escape confinement, and I would affirm the Superintendent's order.

Deits and Riggs, JJ., join in this dissenting opinion.