Argued and submitted on February 28, reversed; order of Department of Human
Services reinstated April 23, petition for review denied July 2, 2008 (345 Or 94)

Clarinda MIDDLETON
and Bill Middleton,
*Petitioners-Respondents,*

*v.*

DEPARTMENT OF HUMAN SERVICES,
*Respondent-Appellant,*

*and*

Michelle HEMPHILL
and Brian Hemphill,
*Intervenors.*

Marion County Circuit Court
06C14565; A135488

183 P3d 1041

Judy C. Lucas, Senior Assistant Attorney General, argued the cause for appellant. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

George W. Kelly argued the cause and filed the brief for respondents.

Mark Johnson argued the cause for intervenors. With him on the brief was Johnson Renshaw & Lechman-Su PC.

Before Haselton, Presiding Judge, and Armstrong, Judge, and Rosenblum, Judge.

HASELTON, P. J.

**HASELTON, P. J.**

The Department of Human Services (DHS) appeals, challenging the circuit court's judgment setting aside DHS's order in an "other than contested case" proceeding. ORS 183.484(1). In that order, DHS determined the adoptive placement of a child, A; specifically, DHS determined that A should be placed for adoption with intervenors, the Hemphills, who had been A's foster parents since he first came into DHS's care as an infant, instead of respondents, the Middletons, who are A's maternal great-aunt and her husband. The Middletons sought judicial review of DHS's order, contending that DHS had erroneously construed applicable law, ORS 183.484(5)(a), and that DHS's order was not supported by substantial evidence in the record, ORS 183.484(5)(b). The circuit court agreed and set aside DHS's order. For the reasons that follow, we reverse the judgment of the circuit court and reinstate DHS's order.

The following facts are not in dispute. A was born in January 2004. When he was five months old, the juvenile court assumed jurisdiction over him because his biological mother was unable to care for him. The identity of A's biological father is unknown. DHS placed A in foster care with the Hemphills. In early August 2004, DHS sent letters to the Middletons, who live in North Dakota, as well as various other relatives, stating, in pertinent part, that it understood that they may be relatives of A, that "DHS must consider placement with family members," and that it was its policy "to ask family members whether or not they would be available as a possible temporary or permanent placement home for a relative child." On August 11, 2004, the Middletons responded that they wanted to be considered as a temporary or permanent placement for A. A's maternal grandmother and one of A's cousins, who also lived in North Dakota, also responded that they wanted to be considered as temporary or permanent placements for A.

In October 2004, after determining that returning A to mother's care was not a viable option, the juvenile court permitted DHS to pursue a plan of adoption for A. The Hemphills expressed an interest in adopting A. In November,

DHS determined that A's grandmother would not be a suitable placement. DHS then contacted the Middletons as well as the cousin who had expressed an interest in having A placed with them. Because of budgetary constraints on performing multiple home studies, DHS requested that the families agree among themselves which family placement should be pursued, and the families agreed that placement with the cousin should be pursued. In December, DHS initiated a foster home study of the cousin in North Dakota through the Interstate Compact for the Placement of Children (ICPC).

Beginning in February 2005, the Middletons began driving to Oregon for monthly visits with A. In March 2005, the North Dakota cousin terminated the home study process and declined to be a placement resource for A. DHS then initiated a foster home study of the Middletons through the ICPC. In May 2005, mother's parental rights were terminated and, around that time, the foster home study was completed, with the Middletons' home being approved for foster care. In June 2005, DHS asked North Dakota, through the ICPC, to complete an adoptive home study of the Middletons.[1] In December 2005, the Middletons' adoptive home study was completed; an updated adoptive home study of the Hemphills was also completed at the same time.

Meanwhile, A continued living with the Hemphills, and, in the fall of 2005, the Middletons began having overnight visitations with A during their monthly visits to Oregon. While the Middletons and DHS perceived the visits to be going well, the Hemphills reported that A (who was then about one and one-half years old) was upset by the visits and exhibited temper problems, poor appetite, and sleep problems after the visits. In December, on the recommendation of A's therapist, DHS agreed to terminate the Middletons' overnight visitations with A.

Because DHS had approved both the Middletons and the Hemphills as potential adoptive resources for A, DHS convened a sensitive issues adoption committee, OAR 413-120-0030, to determine which adoptive placement DHS

---

[1] Apparently the two-step process of doing a foster home study followed by an adoptive home study was necessitated by the fact that North Dakota would not do an adoptive home study until A was formally freed for adoption.

would recommend. That committee, which consisted of three adoption workers, convened on February 9, 2006. The committee reviewed the adoptive home studies and other materials, considering the strengths of both families, as well as potential concerns with each of them. The committee further identified as particular issues in the case the length of time between A becoming legally free for adoption upon the termination of mother's parental rights in May 2005 and the convening of the committee nine months later, as well as the length of time that A had been in foster care. Ultimately, the committee unanimously concluded that, because of the Middletons' level of commitment to A and the family connection, they were the best adoptive placement, with the Hemphills as the back-up choice.

The Hemphills and A's court-appointed special advocate (CASA) sought review of the committee's decision by DHS administration. OAR 413-120-0060. The DHS assistant director appointed Nancy Keeling, a DHS administrator, to undertake that review. Keeling conducted her review in March 2006. She reviewed the committee's decision, as well as the home studies of both families, the chronology of events, correspondence by and in support of each family, and information concerning A's history and current situation, including his degree of attachment to his foster parents. Keeling concluded:

> "It is not surprising that [A] is not as attached to petitioners as he is to the Hemphills. They have been his parents for nearly two years. Remaining with the foster family does not break the attachment the child has with his foster parents and he will likely continue to thrive.

> "Moving [A] to his relatives affords him the opportunity to grow up in his family of origin. He would have relationships with many extended family members as well as the petitioners. The question remains, is this in [A's] best interests, not just for now but over his lifetime. [It is] difficult to discern how fragile [A] is—the issues reported by the therapist are reported through the foster parents and are related to the overnight visits.

> "This decision is fraught with emotions. Many letters have been reviewed from family members, community, legislators, responding to the emotion of the decision to move

[A] from his foster family to his relatives. Correspondence from petitioners has been reviewed—they clearly believe they were never treated equally and the therapist, CASA and staff always leaned toward foster parents even though they made numerous visits to develop a relationship with [A] and demonstrate their serious commitment to keeping this child in their family.

"The unfortunate issue here is the length of time it took to get homestudy approval, and the fact that [A] could not be placed with relatives early on. During that time he attached to his foster parents. The regrettable delay in ICPC between two states meant a year after the mother stipulated [to termination] the adoption committee could finally convene. In that time frame, at the recommendation of the therapist, DHS stopped overnight visits between the relatives and [A]. That decision was critical.

"The CASA, [A's] attorney and the therapist all recommend strongly that [A] remain with current caretakers. All three of these entities have the responsibility to objectively act in the best interest of the child. [A's] mother also asks that he stay with the [current caretakers]—a mediation would be approp[riate].

"Finally, no decision is a decision. It took 21 months from time of placement to adoption committee recommendation. Not moving [A] to relatives early on allowed him to make an undeniable attachment to current caretakers. It is my recommendation to overturn the adoption committee decision and select the current [caretakers]."

The Middletons sought judicial review in Marion County Circuit Court of Keeling's decision as an order in other than a contested case. ORS 183.484. At the hearing, Keeling testified as follows about the criteria that guided her decision:

"I considered all of the information, reviewed everything available to me, which I've listed in my notes. Basically what it came—these were two very good families—very good families. I looked at the Sensitive Issue Committee's considerations. What [it] finally came down to [for] me was the attachment issue and the fact that [A] had been in this placement most of his life. And that the therapist and primarily the two people that the court puts into place to represent the child's best interest—the attorney

and the CASA, who had had a lot of contact with [A]—all strongly recommended that he remain in the home where he was attached and expressed concern that it might not be in his best interest to move him; in fact, were concerned that it might cause him harm."

The parties also presented testimony from various DHS personnel who had worked on A's case, members of the sensitive issues adoption committee, and Mrs. Middleton. The gist of the Middletons' argument to the circuit court was that the sensitive issues adoption committee had done a better job of assessing the situation and had reached the correct conclusion, and that Keeling had erroneously reached the opposite conclusion. DHS countered that Keeling's decision was supported by substantial evidence and that Keeling "was balancing two big overriding themes here; relative placement on one hand, attachment and caretaker placement on another."

The circuit court set aside Keeling's decision. In doing so, the court invoked ORS 183.484(5)(a), which provides that a court may set aside an order "[i]f the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action[.]" The court particularly relied on a provision of OAR 413-010-0340, which provides that the agency "will protect a child's right to live with his or her immediate or extended family except when there is indication that family members will not adequately provide for the child's welfare."[2] Based on its determinations that the Middletons were a part of A's extended family and that, given what it perceived to be a controlling preference for adoptive placements with relatives, substantial evidence did not support Keeling's decision, the court set aside DHS's decision that the Hemphills should be A's adoptive parents.

DHS appeals. DHS contends, first, that the circuit court misinterpreted DHS's administrative rules regarding placement preferences and, second, that the court erred in determining that substantial evidence did not support Keeling's decision.

---

[2] We address that provision, and its proper significance, below. *See* 219 Or App at 465-71.

■■ We begin by reiterating our appellate function in a proceeding pursuant to ORS 183.484. Two provisions are particularly pertinent here. First, ORS 183.484(5)(a) permits a trial court to set aside an agency order if the court determines that the agency has erroneously interpreted a provision of law. We review such a decision by a circuit court for legal error. Second, ORS 183.484(5)(c) provides:

> "The court shall set aside or remand the order if it finds that the order is not supported by substantial evidence in the record. Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding."

In the context of an order in other than a contested case, "the record" is the record developed in the trial court. *Norden v. Water Resources Dept.*, 329 Or 641, 996 P2d 958 (2000). The circuit court's evaluation of the record is limited to whether the evidence would permit a reasonable person to make the determination that the agency made in a particular case. *Id.* at 649 (citing *Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990)). We thus review to determine whether the record developed in the circuit court provides substantial evidence to support DHS's decision.[3]

■ We turn first to whether the circuit court correctly concluded that DHS had erroneously interpreted a provision of law. In particular, DHS disputes the circuit court's conclusion that Keeling's decision did not comport with OAR 413-010-0340. That rule provides:

> "Placement of a child with a relative will not be considered the right of a relative unless the relative has established legal rights to the child in a court of competent jurisdiction. However, SOSCF will protect a child's right to live with his or her immediate or extended family except when there is indication that family members will not adequately

---

[3] As we noted in *Powell v. Bunn*, 198 Or App 21, 29, 108 P3d 37 (2005), *rev'd on other grounds*, 341 Or 306, 142 P3d 1054 (2006):

"The trial court's review was for substantial evidence and errors of law, ORS 183.484(5), and we review the trial court's decision to determine whether it correctly applied its standard of review. * * * In practical effect, that means that we review the agency's order for compliance with the standards set out in ORS 183.484(5)."

(Citations omitted.)

provide for the child's welfare. In determining either the temporary or permanent placement of a child, SOSCF will consider placement with relatives in preference to persons the child does not know if there is reason to believe that the child's relatives will be able to provide appropriate care, stability and security for the child."[4]

As an initial matter, we consider—and reject— DHS's argument that we should defer to an interpretation of that rule that DHS *advanced in the first instance before this court*. DHS asserts, and we do not understand the Middletons to dispute, that "relative," as used in OAR 413-010-0340, means "a grandparent, sister, brother, aunt or uncle," as defined in OAR 413-010-0310. However, DHS also advances the unprecedented assertion that not only are the Middletons not "relatives" for purposes of the rule, but they are not even members of A's "extended family"—a term that is not defined in the rules. DHS never purported to advance, much less rely on, such an understanding during the administrative process; Keeling, specifically, did not espouse or apply such a construction. Nevertheless, DHS now contends that we should defer to its appellate-specific view/ "interpretation" that Mrs. Middleton is not part of A's "extended family." As explained below, even if such an interpretation were plausible in the context of the rules we address below, no such deference is owed under these circumstances.

■ The Oregon Supreme Court has stated that the legislature's entrustment of an agency "with setting standards and with applying them can imply that the agency's view of its standards (assuming that they are within their authorizing law and are consistently applied) is to be given some appropriate respect by the courts." *1000 Friends of Oregon v. LCDC (Lane Co.)*, 305 Or 384, 390, 752 P2d 271 (1988). *See generally Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 881 P2d 119 (1994) (describing court's deference to agency's interpretation of its own rules). "We defer to the agency's plausible interpretation of its own rule—including an interpretation made in the course of applying the rule—if

---

[4] SOSCF (the State Office for Services to Children) is now simply known as DHS. Many of its rules and policies, however, continue to refer to SOSCF.

that interpretation is not inconsistent with the wording of the rule, its context, or any other source of law." *Papas v. OLCC*, 213 Or App 369, 377, 161 P3d 948 (2007).

Such deference, however, is inapposite here. DHS has not "consistently applied" the interpretation that it now advances, *1000 Friends of Oregon*, 305 Or at 390; nor did DHS propound the interpretation now advanced "in the course of applying the rule" in this case, *Papas*, 213 Or App at 377. That is, at the time Keeling made her decision—and, indeed, even at the point that DHS was defending that decision in the circuit court—DHS took the position that the Middletons *were*, in fact, to be considered a part of A's family for purposes of the numerous rules (discussed below) that indicate that DHS will prioritize efforts to place children with family.[5]

With "deference" properly discarded, we consider whether the trial court correctly concluded that DHS's decision that A should be placed for adoption with the Hemphills was based on an erroneous interpretation of a provision of law. ORS 183.484(5)(a). That inquiry implicates, in turn, a variety of interrelated administrative rules and policies, including—but certainly not limited to—the "extended family" provision of OAR 413-010-0340, on which the trial court significantly relied.

We note, at the outset, that DHS, in its rules, emphasizes the importance of maintaining a child's ties to his or her family, while also expressing a transcendent principle that a placement be in the child's best interests. For example, OAR 413-010-0300 provides, in pertinent part, that the agency "recognizes the importance of preserving the family ties and relationships of children who have been placed in the legal custody of SOSCF." At the same time, DHS has an expressed policy that, in making placement decisions, it

---

[5] To conclude otherwise in circumstances such as these would be grossly unfair to the Middletons. As noted above, they became involved in A's life, traveling great distances from North Dakota over a long period of time to visit him, because DHS had contacted them on the ground that it "must consider placement with family members," and that it was DHS's policy "to ask family members whether or not they would be available as a possible temporary or permanent placement home for a relative child." Moreover, DHS acknowledges on appeal that it has "afforded the Middletons consideration as relatives" throughout this proceeding.

"shall be guided by the best interest of the child" and that placement decisions "shall be made in the context of an individualized assessment of the child's total needs, and an assessment of a potential foster or adoptive family's ability to meet those needs." OAR 413-070-0020.

The rules that prescribe how DHS will work with families toward placement of children in DHS's care are found in OAR 413-070-0060 to 413-070-0093. Because they are central to our analysis, we quote from them extensively. OAR 413-070-0060 provides, in pertinent part:

> *"By law, relatives are the placement of preference for children.* These rules describe how SOSCF will search for and work with the relatives of children in SOSCF custody who are in substitute care to develop placements and alternate permanency plans for them. *SOSCF shall consider relatives as the placement of preference, but in making placement decisions shall ultimately be guided by the best interest of the child.* It is the consideration of relatives as the placement of choice that is mandated by federal law, not the actual placement with relatives that is required."[6]

(Emphases added.)

OAR 413-070-0066, entitled "Values and Process," provides:

> "(1)  Each child's placement shall be the one that best meets his or her individual needs for safety, attachment, permanence, and well being.
>
> "(2)  In planning for the placement of a child, SOSCF shall focus on the best interest of the child and treat all persons with respect.
>
> "(3)  Relatives are important to a child's sense of identity and belonging.
>
> "(4)  Early identification of a permanent placement resource is in the best interest of the child.

---

[6] Neither party has suggested that DHS's decision here was either compelled or prohibited by federal law. Accordingly, we do not address the potential application of any federal statutes to the present controversy.

"(5)   SOSCF should consider relatives as both temporary and potential permanent resources for children who are unable to live safely with a parent.

"(6)   Even though a relative may not be able to safely provide care for a child SOSCF should consider ways the relative can be safely and meaningfully involved in the child's life.

"(7)   Working with relatives is a multi-step process including:

"(a)   Identifying the child's needs;

"(b)   Searching for relatives;

"(c)   Identifying the interest of relatives in providing care;

"(d)   Helping families assess the most appropriate role of the relatives in the child's life based on the child's needs and best interests;

"(e)   Assessing the suitability of those relatives who express interest in providing care for a child;

"(f)   If adoption is the plan for the child, completing an adoption home study on those relatives who are suitable and interested;

"(g)   If adoption is the plan for the child, referring an appropriate relative(s) to an adoption committee which may or may not select the relative as the adoptive resource; and

"(h)   Determining what the permanent placement for the child will be."

Significantly, also included within the group of DHS rules related to working with relatives toward placement of children is a provision concerning foster parents. OAR 413-070-0067 provides:

"Although some foster parents become permanent resources for children, at placement it is the responsibility of the worker to inform the foster parent that planning for the child does not necessarily include permanent placement with the foster parents. SOSCF workers shall discuss with foster parents that the foster parent role is that of a transitional resource. The worker shall keep the foster parent

informed of the primary permanent and alternative permanent planning for the child. If the foster parents become interested in the permanent placement of a child in their home, procedures outlined in SOSCF Policy I-G.1.1, Current Caretaker Adoption Planning, apply."

SOSCF Policy I-G.1.1, in turn, cross-references OAR 413-120-0530, which provides, in pertinent part, that, "if a current caretaker expresses interest in being a permanent placement resource for the child in his or her care, the Department determines whether a diligent search for the relatives of a child (see OAR 413-070-0060 to 413-070-0075) has been completed."

OAR 413-070-0069, in turn, governs how the agency goes about identifying relatives of a child in the agency's care. It provides, in part, that the agency "shall search for the relatives as specified in this rule," including

"[a]ny blood relative or half blood relative, including persons of preceding generations denoted by the prefixes of grand, great or great-great who is related to the child through the biological * * * mother[.]"

OAR 413-070-0072 to 413-070-0090 describe the process by which the agency is to search for, communicate with, and determine the potential suitability of, the child's relatives for placement. OAR 413-070-0093 provides for the agency, after it has identified out-of-state relatives as potential placement resources, to utilize the ICPC to obtain the necessary home studies. SOSCF Policy I-E.1.1 tracks those rules, as well.

Finally, both SOSCF Policy I-E.1.1 (relative placement) and SOSCF Policy I-G.1.1 (current caretaker placement) indicate that relatives and current caretakers have priority for consideration in adoptive placement over "general applicants." *See also* OAR 413-120-0010(5) (defining a "general applicant" for adoption as "an individual who is not a current caretaker or a relative").

The foregoing rules prescribe and define a rather complex set of procedures that the agency is charged with carrying out when a child within its care becomes free for adoption. Viewed as a whole those rules indicate that

"relatives are *the* placement of preference," OAR 413-070-0060 (emphasis added), and that a great-aunt, such as Mrs. Middleton, is a "relative" for purposes of that rule. OAR 413-070-0069(1)(a)(A). Further, OAR 413-070-0067 specifies that the foster parents who are current caretakers of a child are to be told that they are considered to be a "transitional resource" for the child—and may not necessarily be the child's permanent placement—and OAR 413-120-0530 indicates that, even "if a current caretaker expresses interest in being a permanent placement resource," the agency must first determine whether a search of "relatives" has been completed.

In sum, those rules, collectively—and when read in conjunction with the directive of OAR 413-010-0340 that DHS "will protect a child's right to live with his or her immediate or extended family except when there is indication that family members will not adequately provide for the child's welfare"—indicate that the agency's first priority in moving toward adoption of a child in its care is to identify potential relatives as placement resources and determine their suitability for placement. To be sure, the rules also provide that foster parents who have the status of "current caretakers" of a child also have a priority; however, those rules, viewed in context, indicate that the current caretakers have priority over "general applicants," but not over relatives, as adoptive placements. *See* SOSCF Policy I-E.1.1, Policy I-G.1.1. Consequently, the circuit court correctly understood that, under DHS's rules, relatives are entitled to preference with respect to adoptive placements.

However, the circuit court erred in understanding, and treating, that *preference* to be a functional *mandate*. That is, the court erred in concluding that the rules *required* DHS to select an adoptive placement with relatives, either as a matter of law in general or as a matter of fact in this case. As noted, although the rules described above indicate that "relatives are the placement of preference," OAR 413-070-0060, they also provide that the agency "shall be guided by the best interest of the child" and that any decision on placement "shall be made in the context of an individualized assessment of the child's total needs, and an assessment of a potential foster or adoptive family's ability to meet those

needs." OAR 413-070-0020. Further, "[e]ach child's placement shall be the one that best meets his or her individual needs for safety, attachment, permanence, and well being." OAR 413-070-0066(1). Finally, once the agency has determined that adoption is the appropriate plan for a child, the agency is to refer appropriate relatives to the adoption committee, "which *may or may not* select the relative as the adoptive resource." OAR 413-070-0066(7)(g) (emphasis added). That is, the administrative rules do not *compel* placement with the relatives.

In this case, DHS did not err as a matter of law in applying its rules. It went through the necessary steps to identify and contact potential relative placements, sought the appropriate home studies, and, when a potential relative placement and a potential current caretaker placement both turned out to be viable placements, convened an adoption committee as contemplated by the rules. OAR 413-120-0030. The decision of the adoption committee, in turn, was reviewed by an administrator, which also is authorized by the rules. *See* OAR 413-120-0060(6)(b) (administrator may review adoption committee decision when the "adoption committee's choice was between a relative and an unrelated current caretaker"); OAR 413-120-0060(10)(b), (c) (administrator may review files and information and issue a decision affirming or changing the committee's decision). In sum, we conclude that the agency followed its rules. The trial court erred in concluding, under ORS 183.484(5)(a), that the agency had erroneously interpreted a provision of law.

■ We turn, finally, to the question whether substantial evidence in the record before the trial court supports Keeling's decision. ORS 183.484(5)(c).

Many of the arguments that the Middletons advanced in the circuit court and in this court emphasize that Keeling should not have overturned the adoption committee's decision because the committee held a hearing on the matter and, in fact, reviewed more information than did Keeling. However, the proper inquiry is not whether substantial evidence supported the adoption committee's decision in favor of the Middletons. Nor is the question whether

Keeling actually considered all of the relevant evidence now on the record when she reached her decision.

Rather, as explained above, in a proceeding pursuant to ORS 183.484, the court's task is to determine whether the record developed in the circuit court provides substantial evidence to support the agency's challenged decision. *See, e.g., Norden,* 329 Or at 649. Such a review does not involve a determination of whether Keeling's decision or the adoption committee's decision was "better," or even whether it was based on "better evidence." The only question is whether Keeling's decision is supported by "substantial evidence."

■■     In *Garcia,* the court stated:

> "[S]ubstantial evidence supports a finding when the record, viewed as a whole, permits a reasonable person to make the finding. ORS 183.482(8)(c). A court must 'evaluate the substantiality of supporting evidence by considering all the evidence in the record.' * * * That is, the court must evaluate evidence against the finding as well as evidence supporting it to determine whether substantial evidence exists to support that finding. If a finding is reasonable in light of countervailing as well as supporting evidence, the finding is supported by substantial evidence."

309 Or at 295 (citations omitted). However, substantial evidence review "does not entail or permit the reviewing tribunal to reweigh or to assess the credibility of the evidence that was presented to the factfinding body." *Tigard Sand and Gravel, Inc. v. Clackamas County,* 151 Or App 16, 20, 949 P2d 1225 (1997), *rev den,* 327 Or 83 (1998) (citations omitted). Further, the reviewing court does not substitute its judgment for that of the agency as to which of two or more permissible inferences should be drawn. *City of Roseburg v. Roseburg City Firefighters,* 292 Or 266, 271, 639 P2d 90 (1981). Consequently, and ultimately, the question here is not whether a reasonable person (or a reasonable adoption committee) could have reached a different conclusion than the conclusion reached by Keeling, but whether a reasonable person could have reached the conclusion that Keeling reached.

The decision at issue in this case—*viz.,* which of two highly suitable families should be chosen as an adoptive placement for A—is the type of decision on which reasonable

minds could (and did) differ. A full description of the evidence in the record as to the parties' particular circumstances would not benefit the parties, the public, the bench, or the bar. One observation suffices: Substantial evidence in the record, and corollary reasonable inferences as to A's best interests, would have supported placement with either party. Consequently, substantial evidence in the record supported DHS's decision, by Keeling, to place A with the Hemphills.

Reversed; order of Department of Human Services reinstated.