Argued and submitted June 10, 2014, affirmed December 30, 2015

PORTLAND POLICE ASSOCIATION,
*Respondent,*

*v.*

CITY OF PORTLAND,
*Petitioner.*

Employment Relations Board
UP02312; A152657

365 P3d 1123

Harry Auerbach argued the cause and filed the briefs for petitioner.

Anil S. Karia argued the cause for respondent. With him on the brief was Tedesco Law Group.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

This case arose out of the 2010 shooting death of Aaron Campbell by Portland Police Officer Ronald Frashour. After an investigation, the City of Portland discharged Frashour from his employment for violating the Portland Police Bureau's use-of-force policies in the shooting. The Portland Police Association filed a grievance on Frashour's behalf that challenged the discharge, and the grievance proceeded to arbitration. The arbitrator determined that the city lacked just cause to terminate Frashour and ordered the city to reinstate him. After the city refused to implement the arbitrator's decision, the association filed a complaint with the Employment Relations Board, contending that the city's refusal to implement the award violated the parties' collective bargaining agreement (CBA), which treats arbitration awards as final and binding. The board upheld the complaint and ordered the city to reinstate Frashour. The city seeks judicial review of the board's final order, contending that the board erred because the arbitrator's award is unenforceable under ORS 243.706(1), which provides, in part:

> "As a condition of enforceability, any arbitration award that orders the reinstatement of a public employee or otherwise relieves the public employee for misconduct shall comply with public policy requirements as clearly defined in statutes or judicial decisions including but not limited to policies respecting * * * unjustified and egregious use of physical or deadly force * * * related to work."

For the reasons explained below, we affirm.

Because the issue on review reduces to a legal question—*viz.*, the proper construction of ORS 243.706(1)—that we review for legal error, ORS 183.482(8)(a), we set out only those facts—taken from the arbitrator's opinion and the board's order—that are needed to give context to the legal dispute.[1] Unless otherwise noted, those facts are undisputed.

On January 29, 2010, while on duty, Officer Frashour shot and killed Aaron Campbell, who was unarmed. The

---

[1] A number of investigatory and quasi-judicial bodies have examined and reported on the events surrounding the shooting. *See* 275 Or App at 702 n 2.

incident began as a welfare check—police had received a call that Campbell, who possessed a gun and was distraught over the recent death of his brother, might be in a certain apartment, might be suicidal, and might be threatening to commit "suicide by police." The situation escalated after Campbell unexpectedly came out of the apartment and did not respond to repeated police instructions to put his hands in the air (he had his hands on top of his head). An officer fired a bean-bag round that hit Campbell, who stumbled and began to run away. The officer fired five more bean-bag rounds at Campbell, who continued running. (There was disputed testimony regarding what Campbell did with his hands while running. According to the board's summary of the arbitrator's findings, Frashour testified that he saw Campbell "bring his left hand down behind his back and turn about 45 degrees toward" a car and that, "[b]y the time [he] finished turning, * * * Campbell's hand was completely in his pants beneath his waistband." Other witnesses testified that Campbell appeared to be reaching toward the place on his body where he had been shot with the first bean-bag round.) Approximately three seconds after Campbell began running, Frashour fired his rifle, fatally shooting Campbell.

Following an investigation of the incident and various reviews,[2] Portland Chief of Police Michael Reese terminated Frashour's employment with the city, concluding that Frashour had violated the Portland Police Bureau's policies on use of force, specifically City Policies 1010.10 (Deadly Physical Force) and 1010.20 (Physical Force).[3] The association

---

[2] The investigation was conducted by the Police Bureau's Internal Affairs Division; subsequently, there was an internal Training Division Review, findings and recommendations from the Police Commander, and review by an independent Use of Force Review Board, all of which recommended Frashour's termination from employment.

Independently of that process, the question of criminal misconduct by Frashour was submitted to a grand jury, which declined to indict him, and the Oregon Department of Public Safety Standards and Training reviewed Frashour's conduct and found that it complied with state training standards.

[3] City Policy 1010.10 provides, as relevant:

"The Portland Police Bureau recognizes that members may be required to use deadly force when their lives or the life of another is jeopardized by the actions of others[.] Therefore, state statute and Bureau policy provide for the use of deadly force under the following circumstances:

filed a grievance challenging Frashour's discharge, and the

"a. Members may use deadly force to protect themselves or others from what they reasonably believe to be an immediate threat of death or serious physical injury.

"* * * * *

"Members must be mindful of the risks inherent in employing deadly force, which may endanger the lives of innocent persons. A member's reckless or negligent use of deadly force is not justified in this policy or state statute. Members are to be aware that this directive is more restrictive than state statutes. Members of the Portland Police Bureau should ensure their actions do not precipitate the use of deadly force by placing themselves or others in jeopardy by engaging in actions that are inconsistent with training the member has received with regard to acceptable training principles and tactics.

"Threat indicators, Levels of Control, and Post Use of Force Medical Attention are outlined in detail in DIR 1010.20 Physical Force."

City Policy 1010.20 provides, in turn:

"The Portland Police Bureau recognizes that duty may require members to use force. The Bureau requires that members be capable of using effective force when appropriate. It is the policy of the Bureau to accomplish its mission as effectively as possible with as little reliance on force as practical.

"The Bureau places a high value on resolving confrontations, when practical, with less force than the maximum that may be allowed by law. The Bureau also places a high value on the use of de-escalation tools that minimize the need to use force.

"The Bureau is dedicated to providing the training, resources and management that help members safely and effectively resolve confrontations through the application of de-escalation tools and lower levels of force.

"It is the policy of the Bureau that members use only the force reasonably necessary under the totality of circumstances to perform their duties and resolve confrontations effectively and safely. The Bureau expects members to develop and display, over the course of their practice of law enforcement, the skills and abilities that allow them to regularly resolve confrontations without resorting to the higher levels of allowable force.

"Such force may be used to accomplish the following official purposes:

"a. Prevent or terminate the commission or attempted commission of an offense[.]

"b. Lawfully take a person into custody, make an arrest, or prevent an escape.

"c. Prevent a suicide or serious self-inflicted injury.

"d. Defend the member or other person from the use of physical force.

"e. Accomplish some official purpose or duty that is authorized by law or judicial decree.

"When determining if a member has used only the force reasonably necessary to perform their duties and resolve confrontations effectively and safely, the Bureau will consider the totality of circumstances faced by the member, including the following:

"a. The severity of the crime.

"b. The impact of the person's behavior on the public.

grievance was submitted to an arbitrator, as provided by the CBA. The parties stipulated that the issues before the arbitrator were whether the city had just cause to discharge Frashour,[4] and, if not, the appropriate remedy.

After 16 days of hearing, during which the arbitrator heard from 31 witnesses and received approximately 115 exhibits, the arbitrator issued a lengthy opinion and award, in which she concluded that the city lacked just cause to terminate Frashour. The arbitrator reasoned, in part, as follows:

"This was a very tragic case, one where the Monday-morning quarterback has the clear advantage when divining what went wrong. The case law regarding the Constitutional use of deadly force has been particularly instructive. Although it turned out that Mr. Campbell did not have a gun with him in the parking lot, [*Graham v. Connor*, 490 US 386, 109 S Ct 1865, 104 L Ed 2d 443 (1989),] and its progeny consistently emphasize that '20-20 hindsight' must be avoided. Further, as the recitation of cases showed, those adjudicators have had little difficulty concluding that if a subject appears to be reaching for what could reasonably be considered a gun, deadly force is justified, even though no weapon has been observed. The courts have not said that every reaching motion justifies lethal force, but where the circumstances indicate that the subject could be armed and has indicated possible intent to use the weapon, then deadly force will survive the Constitutional test. *The Portland Police Bureau directives on lethal force essentially mirror the Constitutional standard articulated by the courts.* The courts are not willing to require law

---

"c. The extent to which the person posed an immediate threat to the safety of officers, self or others.

"d. The extent to which the person actively resisted efforts at control.

"e. Whether the person attempted to avoid control by flight.

"f. The time, tactics and resources available.

"g. Any circumstance that affects the balance of interests between the government and the person.

"The Bureau's levels of control model describes a range of effective tactical options and identifies an upper limit on the force that may potentially be used given a particular level of threat. However, authority to use force under this policy is determined by the totality of circumstances at a scene rather than any mechanical model."

[4] Article 21.1 of the applicable CBA (effective July 1, 2010 to June 30, 2013) provides, in part, that "[d]ischarge or demotion shall be for just cause."

enforcement officers to take risks to themselves or to the safety of others. Further, as the courts have instructed, the determination of reasonableness must make allowances for the split-second decision making that is required of police officers. Although the events here unfolded over a period of time, the critical period was during the few seconds between the time Officer Lewton shot the initial beanbag rounds and the time that Mr. Campbell neared the Volvo. The situation with Mr. Campbell changed very rapidly, forcing [Frashour] to make a quick decision.

"In the instant case, although Mr. Campbell had not committed a crime and displayed some behavior showing surrender and compliance (although this behavior was inconsistent), the Arbitrator concludes that it was reasonable to believe that he could be armed, and that when he ran, there was sufficient evidence for a finding that Mr. Campbell made motions that appeared to look like he was reaching for a gun. The Arbitrator also finds that the reasonable police officer could conclude that had Mr. Campbell pulled a gun, he would have fired it - possibly at others, or perhaps at himself. The case law points to the conclusion that this is a sufficient basis for finding that there was an objectively reasonable basis for believing that Mr. Campbell posed an immediate risk of serious injury or death to others.

"Accordingly, the Arbitrator concludes that the City has not sustained its burden of proving that [Frashour's] use of force violated Portland Police Bureau directives 1010.10 and 1010.20. It lacked just cause to terminate [Frashour], and the grievance is sustained."

(Emphasis added.) The award ordered the city to immediately reinstate Frashour and to make him whole for lost wages.

The city refused to implement the arbitrator's award. The association then filed an unfair labor practice complaint under ORS 243.672(1)(g),[5] contending that the city's refusal to comply with the award violated Article 22.5

---

[5] ORS 243.672 provides, in part:

"(1) It is an unfair labor practice for a public employer or its designated representative to do any of the following:

"* * * * *

"(g) Violate the provisions of any written contract with respect to employment relations including an agreement to arbitrate or to accept the terms of an arbitration award, where previously the parties have agreed to accept arbitration awards as final and binding upon them."

of the CBA, which provides, in part, that "[t]he arbitrator's decision shall be final and binding." In response, the city contended that the arbitration award is unenforceable under ORS 243.706(1) because compliance with it would violate public policy in various respects.

The board concluded that the arbitration award was not unenforceable under ORS 243.706(1) and, therefore, that the city had violated ORS 243.672(1)(g) when it refused to implement the award and reinstate Frashour. The board explained that Oregon appellate court decisions interpreting ORS 243.706(1) have held that "the public policy analysis must be directed at the award, not the [underlying] conduct"; therefore, the board is "not to substitute [its] judgment for the arbitrator's determination of whether the public employee engaged in the conduct resulting in discipline."

Accordingly, the board applied its three-part analysis to determine whether an arbitration award is enforceable under ORS 243.706(1):

> "(1) we determine whether the arbitrator found that the grievant engaged in the misconduct for which discipline was imposed; (2) if so, we then determine if the arbitrator reinstated or otherwise relieved the grievant of responsibility for the misconduct; and (3) if so, we determine if there is a clearly defined public policy, as expressed in statutes or judicial decisions, that applies to the award and makes it unenforceable."

Here, the board concluded that, because the arbitrator found that "Frashour was not guilty of the misconduct for which discipline was imposed," the board's analysis was complete at the first step, and the award was not unenforceable under ORS 243.706(1). The board added, however, that, were it to reach the third analytical step, it still would require the city to implement the award, because "an award reinstating an employee who did not engage in misconduct" does not "violate[] the public policy requirements as clearly defined in statutes or judicial decisions." The board ordered the city to reinstate Frashour, to make him whole as ordered by the arbitrator, and to make him whole for any loss incurred as

---

The statute was amended in 2013, *see* Or Laws 2013, ch 663, § 6; however, because the amendment does not affect our analysis, we refer to the current version here.

a result of the city's failure to promptly implement the arbitrator's award, among other relief.

On review, the city challenges the methodology that the board used to determine whether the award complied with public-policy requirements for purposes of ORS 243.706(1); specifically, the city challenges the board's understanding that the board is not to look beyond an arbitrator's conclusion of "no misconduct" in evaluating whether an award complies with public policy. Under the board's approach, if (as here) the arbitrator finds that the grievant did *not* engage in the misconduct for which he or she was disciplined, then the analysis ends and ORS 243.706(1) simply does not apply. In the city's view, that approach was flawed because it failed to consider that the arbitrator's conclusion that Frashour did not engage in misconduct *itself* violated public policy, specifically, the public policy, "clearly defined in statute and case law, that deference be given to the determination by the Chief of Police of the City of Portland that Officer Frashour's use of deadly force violated the City's policies." As a result, according to the city, the award was unenforceable under ORS 243.706(1), and the board therefore erred in concluding that the city had committed an unfair labor practice when it refused to implement the award. For the reasons explained below, we disagree that the board erred.

ORS 243.706(1) provides, as relevant:

"A public employer may enter into a written agreement with the exclusive representative of an appropriate bargaining unit setting forth a grievance procedure culminating in binding arbitration or any other dispute resolution process agreed to by the parties. *As a condition of enforceability, any arbitration award that orders the reinstatement of a public employee or otherwise relieves the public employee of responsibility for misconduct shall comply with public policy requirements as clearly defined in statutes or judicial decisions including but not limited to policies respecting* sexual harassment or sexual misconduct, *unjustified and egregious use of physical or deadly force* and serious criminal misconduct, related to work."

(Emphases added.) The question presented here is whether, notwithstanding that the parties agreed to binding arbitration of grievances, as authorized by the first sentence of the

statute, the arbitrator's award is nonetheless *not* binding because it is unenforceable under the second sentence of the statute. That requires us to construe the meaning of the second sentence.

Looking first to the statute's text, we note that the public-policy exception to the enforceability of an arbitration award applies to an award that either "orders the reinstatement of a public employee or *otherwise* relieves the public employee of responsibility *for misconduct.*" (Emphases added.) Thus the two actions—reinstatement or relief from responsibility—are tied to the employee's misconduct. That phrasing indicates that the legislature sought to limit an arbitrator's authority to reinstate or otherwise negate the *sanction* imposed on a public employee as the result of misconduct—that is, to ensure that an arbitrator's authority to modify the sanction imposed by the employer for misconduct be constrained by public-policy requirements, including, as relevant here, policies "respecting * * * unjustified and egregious use of physical or deadly force." Contrary to the city's assertion, the statute does not appear to impose that same "public policy" limitation on the arbitrator's review of the misconduct determination itself.

In the context of this case, that understanding of the statute is further supported by the way that the legislature chose to describe the pertinent public policy requirements—*viz.*, policies involving the *"unjustified"* and *"egregious"* use of force. (Emphases added.) In other words, in this context, the phrasing of the public-policy exception to the agreed-upon finality of an arbitration award contemplates that the exception applies only where the arbitrator concludes, consistently with the employer, that the employee violated the employer's use-of-force policies—*viz.*, that the employee's conduct was "unjustified and egregious" under those policies—but nonetheless elects to alter the employer's disciplinary decision. Put another way, the text of the provision indicates that the focus of the public-policy condition is on the *consequence* that an arbitrator imposes for an employee's misconduct. Accordingly, if the arbitrator concludes that there was no misconduct, then the condition in ORS 243.706(1) does not apply.

Indeed, both we and the Supreme Court have previously construed the public-policy exception in ORS 243.706(1) consistently with that understanding of it. *Deschutes Cty. Sheriff's Assn. v. Deschutes Cty.*, 169 Or App 445, 9 P3d 742 (2000), *rev den*, 332 Or 137 (2001), is particularly instructive. In that case, the arbitrator concluded—as the arbitrator did here—that the conduct for which the officer had been disciplined did not violate any established departmental policy and ordered the officer reinstated. *Id.* at 450. In the unfair labor practice action that resulted when the county refused to comply with the arbitrator's award, the board ruled in favor of the county, concluding that the award was unenforceable under ORS 243.706(1) because it "would relieve [the officer] of responsibility for misconduct in violation of the public policy against excessive use of force." *Id.* at 452. However, because the board relied in its decision on the arbitrator's findings of misconduct for which the officer had *not* been disciplined—which was contrary to the parties' collective bargaining agreement—we reversed, holding that ORS 243.706(1) "does not apply under these circumstances."[6] *Id.* at 447. Thus, once the arbitrator concluded—contrary to the county's decision—that the officer had *not* committed the misconduct for which he had been disciplined—the public-policy exception in ORS 243.706(1) simply did not apply. In other words, we upheld the arbitrator's decision regarding the officer's misconduct (or lack thereof) without considering whether that decision *itself* violated a clearly defined public policy respecting use of force. We explained:

"The arbitrator determined that [the officer] was *not guilty* of the misconduct for which he was disciplined. The arbitrator also found that [the officer] was not disciplined for other misconduct. *It does not matter if the County, ERB, or this court agrees with that determination, Eugene [Educ. Assoc. v. Eugene School Dist. 4J]*, 58 Or App [140, 151-52, 648 P2d 60 (1982)]* (upholding ERB's decision not to revisit an arbitrator's unambiguous ruling even though it appeared to be 'self-contradictory, confusing or wrong'). The point is that the County agreed to resolve labor disputes through binding arbitration, and, subject to certain limitations that do not apply here, it must accept the

---

[6] Accordingly, we concluded that the county had committed an unlawful labor practice by refusing to comply with the arbitration award.

outcome. *Willamina Sch. Dist. 30J v. Willamina Ed. Assn.*, 60 Or App 629, 635, 655 P2d 189 (1982) (on appeal following remand of *Willamina I*, this court explained that the refusal of Oregon courts to review the merits of an arbitration award is consistent with state and federal policy favoring the finality of arbitration awards)."

*Id.* at 455 (first emphasis in original; second emphasis added).

Although *Deschutes Cty. Sheriff's Assn.* did not squarely present the issue with which we are confronted here, the necessary import of that decision is that the public-policy exception to the enforceability of an arbitration award set out in ORS 243.706(1) does not apply to circumstances where, as here, the arbitrator rejects the employer's conclusion that the employee had engaged in misconduct. In other words, unless there is misconduct, the award cannot "order[] the reinstatement of a public employee or otherwise relieve the public employee of responsibility *for misconduct*" (emphasis added), which is what triggers the enforceability condition that requires compliance with public-policy requirements. In short, *Deschutes Cty. Sheriff's Assn.* supports the board's interpretation of the statute—namely, that it is the arbitrator's modification of the sanction imposed by an employer for an employee's misconduct that must comply with public-policy requirements.

In *Washington Cty. Police Assn. v. Washington Cty.*, 335 Or 198, 63 P3d 1167 (2003), the Supreme Court further explored the scope of ORS 243.706(1). Significantly, the Supreme Court confirmed our earlier conclusion that, "by its unambiguous terms, that statute 'dictates that the public policy analysis be directed at the arbitration award itself, not the conduct for which discipline was imposed.'" 335 Or at 205 (quoting *Washington Cty. Police Assn. v. Washington Cty.*, 181 Or App 448, 452, 45 P3d 515 (2002), *rev'd and rem'd*, 335 Or 198, 63 P3d 1167 (2003) (brackets omitted)). Thus, the court concluded, the enforceability of the arbitrator's award "does not turn on" whether the employee's conduct—in that case, the purchase and personal use of marijuana and dishonesty about it when confronted with a positive drug test—violated some public policy. *Id.* Rather, the "proper inquiry" was whether "an award ordering *reinstatement* of

an employee" who has engaged in that conduct "fail[s] to comply with some public policy requirements that are clearly defined in the statute or judicial decision." *Id.* (emphasis in original).

Again, that reasoning undermines the city's argument in this case that the board must independently assess the arbitrator's decision regarding Frashour's *conduct—viz.*, that Frashour's conduct did not violate the city's policies on excessive use of force—for compliance with public policy, specifically, a public policy that demands deference to the police chief's conclusion in that regard. That argument essentially reduces to the proposition that Frashour's reinstatement contravenes public policy because Frashour used unjustified and egregious physical force against Campbell—in other words, Frashour should not be reinstated because his *conduct* violated public policy regarding use of force. That approach, with its focus on the officer's conduct rather than on the arbitrator's award, as just explained, has been soundly rejected.

The city does not directly confront the text of ORS 243.706(1), nor does it seriously address those appellate decisions.[7] Rather, the city focuses on legislative history, arguing that the purpose of the statute was, in part, to require more deference to public employers in their decisions regarding whether the use of force was consistent with the employers' policies, and the board's reading of it defeats that purpose because "[i]t immunizes all arbitration awards from review for compatibility with public policy, so long as an arbitrator concludes that an employee 'did not engage in misconduct.'" In the city's view, "it was precisely the second-guessing by arbitrators of local agencies' decisions about whether there was or was not misconduct, and particularly about whether force was or was not justified, that occasioned the Legislature to amend ORS 243.706(1) to require awards ordering reinstatement to comply with public policy." For that proposition, the city relies on a statement made by Senator Neil Bryant, one of the sponsors of

---

[7] It is not until its reply brief that the city mentions *Washington Cty. Police Assn.*, positing three reasons why it is distinguishable. None of those reasons withstand examination.

the bill that enacted the provision, during a conference committee hearing on the bill. Senator Bryant explained that the "unjustified and egregious use of physical or deadly force * * * related to work" language was included in the public-policy exception "in response to a situation in Portland where an arbitrator reinstated a police officer who had fired [shots], I think 25 times, and the chief of police in his investigation, concluded that no firing [of shots] was justified." Testimony, Conference Committee on SB 750, June 1, 1995 (statement of Sen Neil Bryant) (reprinted in *Deschutes Cty. Sheriff's Assn. v. Deschutes Cty.*, 17 PECBR 845, 877-78 (Appendix A) (1998), *rev'd*, 169 Or App 445, 9 P3d 742 (2000), *rev den*, 332 Or 137 (2001)) (first brackets in original). Based on that statement, the city asserts that "the Legislature intended for arbitrators to give deference to plausible assessments by local police agencies of the appropriateness of the use of force by their officers."

We disagree. "[T]he extent of the court's consideration of [legislative history proffered by a party], and the evaluative weight that the court gives it, is for the court to determine." *State v. Gaines*, 346 Or 160, 172, 206 P3d 1042 (2009). That is, we are obligated to consider proffered legislative history "only for whatever it is worth—and what it is worth is for [us] to decide." *Id.* at 173. Here, we give the legislative history proffered by the city little weight, for the following reasons.

First, as always, the best indicator of the legislature's intention is the text of the statute itself, *id.* at 171, and nothing about the text of ORS 243.706(1) indicates that the legislature intended to require arbitrators to defer to public employers' decisions on whether their employees have engaged in misconduct. The legislature easily could have said that if that is what it intended. Nor did the legislature indicate that such deference was intended especially with respect to this particular public policy—that is, the legislature did not provide a separate standard by which to consider public-policy requirements respecting the "unjustified and egregious use of physical or deadly force" as compared to other policies enumerated in the statute—for example, policies respecting "sexual harassment or sexual misconduct."

As we have noted, "[e]ven assuming that the legislative history" supports a party's proposed construction of a statute, "we are required not to construe a statute in a way that is inconsistent with its plain text." *Suchi v. SAIF*, 238 Or App 48, 55, 241 P3d 1174 (2010), *rev den*, 350 Or 231 (2011).

Second, the legislative history is not necessarily supportive of the city's construction of the statute. The statement by Senator Bryant identified by the city is not the full extent of his remarks to the conference committee. He continued:

> "This language * * * was intended to address that type of a situation where you have a real misjudgment in the use of physical or deadly force that might be applied. * * * The arbitrator has to take that into consideration, *when he considers from a public policy requirement, what the discipline has been*."

Testimony, Conference Committee on SB 750, June 1, 1995 (statement of Sen Neil Bryant) (reprinted in *Deschutes Cty. Sheriff's Assn.*, 17 PECBR at 878) (emphasis altered). That statement tends to support the board's reading of the statute rather than the city's—that is, that what must be consistent with public policy under ORS 243.706(1) is the discipline imposed by the arbitrator for the misconduct, not the misconduct determination itself. At the very least, the legislature's intention in enacting the statute is not as clear as the city makes it out to be.

Third, as discussed above, judicial decisions have previously construed the public-policy exception in a manner that conflicts with the city's proposed construction of it. *See, e.g., Washington Cty. Police Assn.*, 335 Or at 205 (holding that the public-policy analysis under ORS 243.706(1) is "directed at the arbitration award itself, not the conduct for which discipline was imposed" (internal quotation marks omitted)); *Deschutes Cty. Sheriff's Assn.*, 169 Or App at 453 ("Under the statute, it is the *award* that must comply with public policy." (Emphasis in original.)). Given all those circumstances, we reject the city's argument that legislative history makes it "clear that the Legislature intended for arbitrators to give deference to plausible assessments

by local police agencies of the appropriateness of the use of force by their officers."

In sum, we agree with the board that ORS 243.706(1) is inapplicable in this case because the arbitrator concluded that Frashour did not violate the city's use-of-force policies. In other words, because the arbitration award did not order the reinstatement of an officer who had committed the misconduct for which he had been discharged, the public-policy exception to the enforceability of an arbitration award did not come into play, and the board correctly determined that it was an unfair labor practice for the city to refuse to comply with the award.

Furthermore, even if we were to accept the city's argument that the board was required to review the arbitrator's conclusion regarding misconduct to determine whether *it* complies with clearly defined public policy, the city's challenge to the enforceability of the award still would fail. That is so because the city has failed to identify statutes or judicial decisions "clearly defin[ing]" a public policy requiring deference to a police chief's determination regarding whether an officer has violated a city's use-of-force policies. *See Salem-Keizer Assn. v. Salem-Keizer Sch. Dist. 24J*, 186 Or App 19, 24-25, 61 P3d 970 (2003) (for ORS 243.706(1) to bar the enforcement of an arbitration award, "the award must order something that either the legislature or the courts have determined to be contrary to public policy").

On review, the city focuses on ORS 181.789(2) (set out below) as the source for the public policy on which it relies. Specifically, the city's thesis is that the legislature has established, in ORS 181.789(2), a clearly defined public policy that deference be given to a police chief's plausible interpretation and application of a police department's use-of-force policies. Because the arbitrator made an independent determination that Frashour's conduct did not violate the police bureau's use-of-force policies—and did so by relying on Fourth Amendment standards governing excessive use of force—the award, in the city's view, violates the public policy that requires deference to the chief's understanding of the bureau's use-of-force policies and is therefore unenforceable under ORS 243.706(1). According to the city, the public

policy established in ORS 181.789(2) "requires deference to the City's and the Chief's determination to hold Portland police officers to standards *more restrictive* than the minimums the Constitution requires."[8] (Emphasis added.) Stated more broadly, the city's theory is that the arbitration award in this case does not comply with "clearly defined" public policy—and therefore cannot be enforced—because it "constrains impermissibly the authority of the Chief of Police to manage the use of force by his own officers," in contravention of ORS 181.789(2).

We disagree with the city that ORS 181.789(2) establishes a clearly defined public policy requiring deference to the police chief's decision on whether an officer's conduct comports with the bureau's use-of-force policies. ORS 181.789(2) provides:

> "A law enforcement agency shall adopt a policy dealing with the use of deadly physical force by its police officers. At a minimum, the policy must include guidelines for the use of deadly physical force."

Thus, the statute simply expresses a policy requiring law enforcement agencies *to adopt* use-of-force policies applicable to their officers; it says nothing about the deference to be accorded to an agency's *application* of those policies— that is, to the agency's determination whether an officer's conduct conforms to the policies. To accept the city's argument would require us to superimpose (notwithstanding the clear words of the statute) an additional expression of public policy—that is, one favoring decisions by law enforcement agencies on whether their use-of-force policies have, in fact, been violated, notwithstanding the city's agreement to final and binding arbitration of disciplinary grievances. We can find no justification for doing that. Contrary to the city's position, the fact that the legislature enacted a public policy requiring law enforcement agencies to adopt use-of-force policies does not also reflect a policy decision that law enforcement agencies must solely determine whether

---

[8] In the city's view, that policy is also "underscored" by federal civil rights statutes, 42 USC section 1983 and 42 USC section 14141, and decisions interpreting them, that, according to the city, "make the City and the Chief of Police personally answerable when their policies cause the deprivation of federally protected civil rights through the use of excessive force by their police officers."

an officer's conduct conforms to those policies. That is simply more weight than the statute can bear. *See Washington Cty. Police Assn.*, 335 Or at 205-06 ("[T]o be pertinent to our analysis, a statute or judicial decision must outline, characterize, or delimit a public policy in such a way as to leave no serious doubt or question respecting the content or import of that policy.").

The city also points to judicial decisions, specifically *Middleton v. Dept. of Human Services*, 219 Or App 458, 466-67, 183 P3d 1041, *rev den*, 345 Or 94 (2008), and cases it cites, for example, *1000 Friends of Oregon v. LCDC (Lane Co.)*, 305 Or 384, 390, 752 P2d 271 (1988), and *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 881 P2d 119 (1994), as establishing a public-policy requirement that the city's "view" of its own policies, including whether Frashour violated them, is entitled to deference by an arbitrator. Those cases are inapposite. They address the limitation on a *court's* authority to overrule an agency's plausible interpretation of the agency's own *rule*, based on the statutory provisions of the Oregon Administrative Procedures Act (APA). *See, e.g., Don't Waste Oregon Com.*, 320 Or at 142 (court not authorized under ORS 183.482(8)(a) to overrule agency order where "the agency's plausible interpretation of its own rule cannot be shown either to be inconsistent with the wording of the rule itself, or with the rule's context, or with any other source of law"); *Papas v. OLCC*, 213 Or App 369, 377, 161 P3d 948 (2007) (in reviewing an agency order under ORS 183.482(8), "[w]e defer to the agency's plausible interpretation of its own rule—including an interpretation made in the course of applying the rule—if that interpretation is not inconsistent with the wording of the rule, its context, or any other source of law"). Those decisions cannot be said to clearly define, in a context outside the APA, a public policy requiring an *arbitrator* to defer to a decision by a *law enforcement agency* with respect to the interpretation and application of its use-of-force *policies*.

For the first time in its reply brief, the city takes a slightly different tack. Specifically, the city argues that the arbitrator, in concluding that Frashour's use of force did not violate the city's use-of-force policies, essentially *adopted* a use-of-force policy that is inconsistent with that established

by the city, thus violating the public policy expressed in ORS 181.789(2) that assigns that responsibility to law enforcement agencies. The crux of the city's argument is that, in reaching her decision, the arbitrator disregarded the text of the relevant policies, as well as testimony by the Chief of Police that the city's policies are intended to be more restrictive than constitutional standards, and, therefore, "arrogated to herself the adoption of a policy inconsistent with that established by the responsible law enforcement agency officials." That argument essentially reduces to an assertion that the arbitrator made a legal error in interpreting the city's use-of-force policies. However, as the city acknowledges, the fact that the arbitrator made a mistake of law or fact is not a basis to refuse to enforce an arbitration award that the parties otherwise agreed would be final and binding. Thus, that argument also lacks merit.

The arbitration award ordering the city to reinstate Officer Frashour is not unenforceable under the public-policy exception stated in ORS 243.706(1). Accordingly, because the city agreed to final and binding arbitration, the board correctly determined that the city violated ORS 243.672(1)(g) when it refused to comply with the award.

Affirmed.